UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                      :

ENIGMA SOFTWARE GROUP USA, LLC,     :
                                        :

                    Plaintiff,      :
                                        :    Case No. 1:16-cv-00057 (PAE)

             -against-            :

BLEEPING COMPUTER LLC and          :
DOES 1-10,                         :
                                        :    **SECOND AMENDED COMPLAINT**

                    Defendants.   :
                                        :
-------------------------------------------------------x

       Plaintiff Enigma Software Group USA, LLC ("ESG"), by its attorneys, for its Second Amended Complaint against Defendants Bleeping Computer LLC ("Bleeping") and Does 1-10, respectfully alleges as follows:

**SUMMARY OF THE CASE**

       1.     This is an action for civil remedies, including injunctive relief and damages, under the federal Lanham Act and under New York State law, arising out of the malicious publication and use in commerce of false, misleading, disparaging, and defamatory statements by Bleeping and Does 1-10 regarding ESG and its SpyHunter software product.

       2.     Bleeping owns and operates a website at <http://www.bleepingcomputer.com> (the "Bleeping Website") that Bleeping advertises to the public as a "premier" destination for computer users to learn how to use and receive support for their computer and a place "for the novice user to learn basic concepts about Computer Technology."

       3.     Bleeping further touts its "staff" as providing "high quality and expert responses" to questions and represents to consumers that its "staff" "can be trusted to give correct and

understandable answers" to computer system, technical and operational questions from the users.

4.      Bleeping targets all types of consumers -- individuals, employers, businesses, and clients, to name a few -- who often do not know the "basic concepts" that underlie computer system and operational issues and rely on Bleeping's representations and recommendations when purchasing, among other things, security protection software products that protect against viruses and hackers.  As a necessary consequence, these consumers often are not in a position to assess, measure or fully evaluate the accuracy and/or reliability of statements made by Bleeping, making it all the more necessary that Bleeping meets its self-proclaimed standards of giving truthful, accurate, non-biased information to its users.

5.      As noted, one of the most important areas in which Bleeping provides computer system installation and operational information to novice users concerns anti-malware software, which attempts to protect users from malicious computer programs that can, among other things, lead to data destruction, identity theft, and unauthorized access to sensitive individual and/or employer/business information.

6.      Based on Bleeping's own self-designed and self-proclaimed business model, consumers look to Bleeping to provide accurate, truthful, unbiased information about anti-malware products and rely upon Bleeping's computer science information to make critical decisions about purchasing anti-malware products that will protect them from the dangers of malicious computer programs — which is an area of particular heightened concern for consumers given the daily risks faced by computer users of their personal or business computer systems being hacked in today's environment of computer system breaches, both from domestic and international computer hacker threats.

7.      Bleeping, however, uses its Bleeping Website to generate profits for itself by

promoting and recommending anti-malware products for which it receives commissions.  Under the guise of giving "correct and understandable answers," Bleeping purposely pushes users away from anti-malware products for which it does not receive commissions and toward specific anti-malware products for which it receives sales commissions.

8.      Bleeping furthers its business model by providing hyperlinks to the anti-malware products for which Bleeping receives commissions any time its "staff" mentions such a product. Through only a few clicks on the computer screen, Bleeping takes its user from the Bleeping Website directly to the third-party webpage where the user can buy the product that earns Bleeping a commission.

9.      On information and belief, Bleeping purposefully designed its website to bury the fact that it receives commissions from the products it promotes by placing the disclosure in one hard-to-find location on its website that consumers are unlikely to frequent.

10.     One of the products Bleeping promotes -- and a product it receives revenues based on direct commissions for selling -- is sold by Malwarebytes, a direct ESG competitor.  On information and belief, these commissions are not insignificant to Bleeping's financial revenues and success.

11.     Bleeping does not receive and has never received commissions from ESG, whose products it has a pattern of smearing through false and misleading statements on its Website.

12.     Thus, Bleeping has a direct financial interest in driving traffic and sales to Malwarebytes and driving traffic and sales away from ESG.

13.     To further that interest, Bleeping as part of its business model has adopted and employed a pattern of making false, inaccurate, misleading and disparaging statements about ESG and ESG's products that protect computers and computer users from hackers, breaches and

security threats, for the purpose of steering consumers away from purchasing ESG's products while simultaneously recommending that its "novice" forum members use Malwarebytes programs for which Bleeping is paid commissions.

14.     Bleeping not only has unlawfully benefited in cash revenues from its dissemination of false, misleading and inaccurate information about ESG to the detriment of ESG and consumers, but it also has damaged the reputation of ESG by refusing to take down its false and misleading statements which, with Bleeping's encouragement and express permission, have been posted and reposted numerous times on other anti-malware related forums and websites.

15.     ESG brings this lawsuit to put an end to Bleeping's smear campaign and to stop the false and misleading information Bleeping has published, disseminated and promoted and continues to publish, disseminate and promote to the detriment of ESG and consumers.

## THE PARTIES

16.     Plaintiff ESG is a Florida limited liability company, having merged with a Connecticut limited liability company of the same name.  ESG does business in this District, but none of ESG's members is a resident or citizen of the State of New York.

17.     Upon information and belief, Defendant Bleeping is a New York limited liability company with a business address at P.O. Box 1025, Melville, New York 11747.

18.     Upon information and belief, Defendants Does 1-10 are entities and individuals that have acted on behalf of or in conjunction with Bleeping in carrying out the acts complained of herein.

## JURISDICTION AND VENUE

19.     This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and the laws of the State of New York.  This Court has subject matter jurisdiction, *inter alia*, pursuant to 28

U.S.C. §§ 1331, 1332, 1338, and 1367.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### Background

21.     ESG develops and markets computer security products with a particular focus on protecting its millions of customers from computer hacks, system breaches, identity theft and system computing malware, as well as other computer security threats.

22.     As described by the Federal Trade Commission (<https://www.ftc.gov/news-events/media-resources/identity-theft-and-data-security/spyware-and-malware>): "[m]alware, short for 'malicious software,' includes viruses and spyware that can steal personal information, send spam, and commit fraud.  Criminals use appealing websites, desirable downloads, and compelling stories to lure consumers to links that will download malware – especially on computers that don't use adequate security software.  Spyware is one type of malware that can monitor or control your computer use.  It may be used to send consumers pop-up ads, redirect their computers to unwanted websites, monitor their Internet surfing, or record their keystrokes, which, in turn, could lead to identity theft."

23.     ESG protects its customers from this array of serious risks by providing software that detects and removes malware, enhances Internet privacy, and eliminates other security threats.

24.     ESG's flagship anti-malware product is a software program called SpyHunter, which presently is in version 4.

25.     ESG sells licenses to SpyHunter solely over the Internet, including at its website, <http://www.enigmasoftware.com>.  ESG enjoys worldwide sales of SpyHunter, including sales to citizens of the State of New York.

5

26.     SpyHunter is an adaptive malware detection and removal tool that provides rigorous protection against the latest malware threats including spyware, Trojans, rootkits, and other malicious software.

27.     Consumers can download a free scanning version of SpyHunter through a link entitled "Download Free Scanner."  The scanner detects whether a computer has malware or other threats.

28.     ESG informs consumers that they also have the choice to buy a license to the full version of SpyHunter and provides consumers with a "Buy Now" link.  The full version of SpyHunter includes the scanner, tools to remove malware and other security protection tools.

29.     ESG's SpyHunter product has received top industry certifications.

30.     SpyHunter has received the Checkmark Certification from West Coast Labs. Checkmark Certification is a highly regarded accreditation program, recognized globally by vendors, end users, and government agencies as providing reliable confirmation of a product's effectiveness in an ever-changing threat landscape.  Checkmark Certification validates the functionality and performance of both content and network security technologies in a range of threat scenarios and attack vectors from standard baseline benchmarking tests against accepted industry standards.

31.     ESG is a Better Business Bureau accredited business.  Better Business Bureau accreditation standards include a "commitment to make a good faith effort to resolve any consumer complaints."  ESG has received an "A+" rating from the Better Business Bureau.

**Bleeping Is A Commercial Enterprise That Earns Profits By Peddling The Products For Which It Receives Commissions and Financial Gain**

32.     Defendant Bleeping holds itself and its designated staff members out as experts in computer security technical and operational matters that novice users can rely upon and trust to

provide correct, unbiased and truthful advice.

33.     Upon information and belief, Bleeping and its designated staff members do not provide such unbiased advice, but rather, under the guise of giving users "advice," seek to influence users to purchase certain software for which Bleeping receives commissions and from which it builds its revenues.

34.     Bleeping owns and controls the Bleeping Website, which is divided into several sections: (1) News; (2) Downloads; (3) Virus Removal Guides; (4) Tutorials; (5) Deals; (6) Forums; and (7) More.

35.     Bleeping generates profits through, among other things, the placement of "Affiliate Links" on its website.

36.     To create Affiliate Links, Bleeping uses a program called "SkimLinks" that automatically transforms posted links and certain keywords into affiliate links.

37.     By providing Affiliate Links, Bleeping earns a commission if a consumer simply clicks on the link and then purchases the product that Bleeping is peddling.

38.     Bleeping pushes consumers to products that earn them commissions through its "Virus Removal Guides," which "use programs and utilities that generate commissions for [Bleeping] when [a user] purchase[s] them." *See* Ex. 1.  Upon information and belief, Bleeping does not disclose its self-interest in the products used in its Virus Removal Guides within the Guides themselves.

39.     In its "Downloads" section, Bleeping provides "special offers and affiliate links that will generate a commission for [Bleeping] if [the user] purchase[s] the software." *See* Ex. 1. Upon information and belief, Bleeping does not disclose its self-interest in the products that Bleeping provides in the Download section of the Bleeping Website.

40.     Similarly, Bleeping provides Tutorials that "may discuss or require specific hardware or software that contain affiliate links that will generate a commission for [Bleeping] if [a user] purchase[s] them." *See* Ex. 1.  Upon information and belief, Bleeping does not disclose its self-interest in the products used in its Tutorials within the Tutorials themselves.

41.     Bleeping uses Affiliate Links not only in the Virus Removal Guides, Downloads, and Tutorials sections that it offers consumers, but also on its forums where users and Bleeping's "staff" comment on and post information about topics related to computer technology.

42.     In the "About BleepingComputer" portion of its website, which can be accessed only from a link at the very bottom of the Bleeping Website, Bleeping explains that it uses Affiliate Links that "generate a commission for [Bleeping] if [a user] use[s] them to purchase a product." *See* Ex. 1.  Bleeping further admits on that page that "the products that we [Bleeping] routinely use in our guides and that we receive affiliate commissions from are MalwareBytes, Emsisoft, and SuperAntiSpyware." *See* Ex. 1.  Upon information and belief, Bleeping generally does not include this disclosure elsewhere on the Bleeping Website, including on its security forums.

43.     The Bleeping Website is designed, operated, and intended as a commercial enterprise that generates revenues through advertising and commissions from affiliates whose products Bleeping promotes and sells through its website.

44.     Through Bleeping's chosen mode of operation, Bleeping functions as a sales arm of Malwarebytes.

**Bleeping And Its Handpicked, Specially Appointed Moderators Control, Directly And/Or Indirectly, The Content On Its Forums**

45.     To direct and control the functioning and content of the forums on the Bleeping Website, Bleeping has purposely designed, structured and implemented a special hierarchy of

"member groups."

46.     Bleeping provides its members with a "current list" of the individuals who are in each "member group" and informs users of its website about the "member group" status of such persons when they post information on Bleeping's forums, including whether they are a designee to act on behalf of Bleeping.  *See* Ex. 2.

47.     The highest level "member group" specifically designated and appointed by Bleeping is "Admin & Site Admins."  Lawrence Abrams, the owner of Bleeping, is the overall "Admin" of the Bleeping Website and forums and has the final say when appointing all other staff positions.

48.     The second-highest level "member group" specifically designated and appointed by Bleeping is "Global Moderator & Moderators."

49.     Bleeping holds Global Moderators out to its members as top computer system experts and describes them as follows:

> A Bleeping Computer Global Moderator or Moderator is someone granted special powers by the Admins to enforce the rules of Bleeping Computer Forums.  All moderators on all forums can move discussions to different sections of the forum, "close" discussions to prevent users from continuing to discuss them, as well as edit the content of individual posters.  Moderators of both levels answer questions (or help people with problems), and "pin" discussions so they remain visible in their forum section even if no new postings are made to them.  Global Moderators have a few additional powers above that of regular Moderators, the most important of which is the ability to suspend forum posting privileges of members who violate forum rules.

*See* Ex. 2.

50.     The third-highest "member group" specifically designated and appointed by Bleeping is "Advisors."

51.     Bleeping holds Advisors out to its users as follows:

> Bleeping Computer Advisors are regular forum contributors who have been nominated by other current Advisors or other members of the staff as a result of their consistently high quality and expert responses to people's questions in the forums; Advisors can be trusted to give correct and understandable answers to our member's questions.

*See* Ex. 2.

52.     As noted, Bleeping, on its own and through its own decision making, actively selects which members are appointed as Global Moderators, the top echelon experts, as well as Moderators and Advisors, and assigns them each specific duties.

53.     Upon information and belief, Bleeping's Global Moderators, Moderators, and Advisors are authorized to and expected to post in Bleeping's forums.  When they make a posting, Bleeping clearly identifies that the post has been made by a Global Moderator, Moderator, or Advisor.  *See, e.g.*, *infra* at ¶ 69.

54.     In addition to designating Advisors, Moderators, and Global Moderators to generate and control content on its forums, Bleeping has also designed, structured and implemented a malware removal training program, which it calls the "Bleeping Computer Malware Study Hall."  *See* Ex. 2.

55.     The program is taught by "Malware Response Instructors" and overseen by "Malware Study Hall Admins," each of whom is ultimately specifically selected and appointed by Bleeping itself as part of its business model.

56.     Bleeping requires individuals to apply for the position and then determines whether to accept the applicant to the program as a "Malware Trainee."  In the third stage of the training, when the individual is a "Malware Study Hall Senior," Bleeping requires the trainee to assist forum users with technical and operational computer problems "under the assistance and supervision of [Bleeping] instructors."

57.     Bleeping represents that the purpose of the training program is for Malware Trainees to "gain[] the knowledge and study[] the theory behind the analysis of Malware removal logs, with the aim of eventually joining the Malware Response Team."

58.     In addition to the Malware Response Team's moderator duties, Bleeping instructs its Malware Response Team to assist forum users with specific malware removal processes.

59.     Upon information and belief, Bleeping instructs its Malware Trainees to use specific Bleeping-approved methods, tools, and programs for malware removal.  Once Malware Trainees are elevated to members of the Malware Response Team, they are expected when posting in Bleeping's forums to continue using and recommending the methods, tools, and programs they were taught in Bleeping's training program.

60.     Bleeping promotes and/or effectively represents to its users that its Global Moderators, Moderators, Advisors, Malware Response Team Members, Malware Response Instructors, and Malware Study Hall Admins are "staff members."

61.     On information and belief, Bleeping does not require its "staff members" to disclose their business affiliations, even when the Bleeping "staff member" also holds a position with one of Bleeping's Affiliates to whom Bleeping directs sales to achieve commission revenues.  *See, e.g.*, Ex. 3.

62.     Upon information and belief, Bleeping maintains a policy of directing its staff members to recommend and promote certain products for which it receives commissions from which it builds its revenues and to discourage use of other products from which it does not receive commission.

63.     In fact, Bleeping has a policy that "[p]osting referral links to non-Bleeping Computer malware removal guides is generally NOT permitted in this or any other forum with the exception of well known security vendors like Kaspersky, ESET, Symantec, etc which sometimes release specialized fix tools with instructional documentation."

64.     On Bleeping's forums, Bleeping "staff" members routinely recommend and promote products offered by Bleeping's affiliates, including Malwarebytes.

65.     One of Bleeping's "staff" members is known as "Quietman7."  He serves as one of the top echelon computer system experts specially appointed by Bleeping, a Global Moderator.  Upon information and belief, at all relevant times there have been only three Global Moderators.

66.     In March 2006, Bleeping announced to its users that it had specially appointed Quietman7 as an Advisor.  *See* Ex. 4.

67.     Bleeping made the announcement with a post entitled "New Advisor--quietman7" in which Bleeping stated: "***Quietman7 has quietly been added to the staff*** here at BC [Bleeping Computer] as an advisor.  Now we can shout a warm welcome!!!!  Congratulations, welcome, and thanks for becoming an even larger asset for BC [Bleeping Computer]!"  *See* Ex. 4 (emphasis added).

68.     Mr. Abrams, the owner of Bleeping and sole administrator for the entire Bleeping Website, responded to the March 2006 post by congratulating Quietman7 and thanking him "***for accepting the position***" to which Quietman7 responded "***it is a pleasure to be part of the BC [Bleeping Computer] staff*** . . . ."  *See* Ex. 4 (emphasis added).

69.     In September 2007, Mr. Abrams himself created a post entitled "Big Thank You To Our Newest Global, Quietman7" in which he announced to Bleeping's forum users that

Quietman7 had accepted the "position, of Global Moderator here at BC [Bleeping Computer]."

*See* Ex. 5.

70.     Quietman7 responded to the announcement as follows:

> Thanks everyone and thanks Grinler [Abrams' username] for
> offering the sentence … grrr … I mean position.  There are not
> many [web]sites who will give an ex-cop, now a "Bleepin' Janitor"
> the keys to the kingdom.  Usually I only get the keys to the broom
> closet and back door so I can take out the trash.

*See* Ex. 5.

71.     Since he became a Global Moderator, Quietman7's posts have prominently

identified him as a Global Moderator.  Recently, he has also begun to sign posts as "***The BC***

***Staff***" (emphasis added).

72.     As the picture below from Bleeping's website shows, Bleeping and Quietman7

further promote Quietman7 as a special staff spokesman for Bleeping by using Bleeping's own

proprietary business name in identifying Quietman7 to users on the Bleeping Website as the

"Bleepin' Janitor" and using a well known image of "Dick Tracy" as Quietman7's avatar -- a

not-so-subtle and deliberate use of the iconic police detective who was universally viewed as an

idealized police figure committed to chasing rogues.



73.     Upon information and belief, in addition to serving as a Global Moderator,

Quietman7 is active in Bleeping's malware removal training program, providing instruction

and/or administrative support for other Bleeping "staff" members.

74.     In his role as one of only three Global Moderators and as a "staff member" of Bleeping, Quietman7 is and acts as an agent of Bleeping.

75.     Quietman7 and Bleeping's other "staff" members routinely promote Malwarebytes in their forum postings to advocate consumers purchasing Malwarebytes' products for which Bleeping receives commission revenues.

76.     Quietman7 and other Bleeping "staff" also routinely engage in a pattern of disparaging ESG and misleading consumers through false and misleading information about ESG and its products.  Upon information and belief, Bleeping's conduct is not a mere coincidence.

77.     Indeed, upon information and belief, Malwarebytes has provided thousands of dollars of funding to Bleeping's defense of this action.  This direct financial support from Malwarebytes to Bleeping is further evidence of the common interest between them -- both profit from Bleeping's dissemination of inaccurate, false and misleading information to consumers about ESG for the express business motive of driving consumers away from ESG's products and to purchasing Malwarebytes' products, from which Bleeping can build its revenues based on commissions from Malwarebytes.

**Bleeping Makes False, Misleading, And Defamatory Statements Both Directly And Indirectly About ESG And Its SpyHunter Product**

78.     In the forums that Bleeping maintains on its website, Bleeping purports to convey factual information about ESG and its products including, but not limited to, in posts by Bleeping's agent and appointed Global Moderator, Quietman7, but instead assert inaccurate information, outright falsehoods and misleading statements that are repeated in multiple topics on the forum and over multiple years -- damaging both ESG and consumers.  *See* Exs. 6-8.

79.    By virtue of Bleeping's promotion and representation regarding of its "staff" (*see*, *e.g.*, *supra* ¶¶ 2-3), consumers and users of Bleeping's forums understand those posts to be factual and believe that they convey true information.

80.    In these posts and reports of these posts, Bleeping makes the following assertions falsely and without any reasonable basis to believe that the statements were true when made:

- That ESG engages in "deceptive advertising which violates several consumer protection laws in many states";

- That ESG has a "history of employing aggressive and deceptive advertising";

- That SpyHunter 4 is and/or should be considered a "rogue product," which is a term used to identify products supposedly of unknown, questionable, or dubious value as anti-spyware protection;

- That ESG has not cooperated in submitting Spyhunter for testing "most likely due to the program's ineffectiveness and high rate of false positives";

- That ESG engages in deceptive pricing;

- That SpyHunter 4 is a "dubious and ineffective program" and is part of a "scam";

- That ESG deceives consumers of SpyHunter 4 because the consumers "are not aware that when purchasing SpyHunter, they have agreed to a subscription service with an automatic renewal policy"; and

- That SpyHunter 4 is and/or should be considered "malware" or "rogue security software" despite not being classified as such by security vendors.

*See* Exs. 6-8.

81.    Each of those statements, which go directly to the nature, characteristics and qualities of ESG's business and its SpyHunter product, is false and misleading and was false and misleading when made, either directly on their face or as innuendo, indirect intimation, and ambiguous suggestion that results in a sophisticated deception of the consumer.

82.    Upon information and belief, Bleeping, through its agent Quietman7 or otherwise, has never properly or fully tested SpyHunter4 to determine the effectiveness of the program or

its supposed rate of false positives, despite knowing that testing is the only reasonable way to reliably determine a program's effectiveness and rate of false positives.

83.    Bleeping knew, recklessly disregarded, or should have known, that its statements about ESG and SpyHunter were false and misleading when made.  Indeed, where Bleeping identifies a supposed external source for its statements, the citations are to third-hand information that is between 7-10 years old and that was generated by a group of individuals who previously were engaged in an anticompetitive campaign against ESG.

84.    Bleeping knew, recklessly disregarded, or should have known that ESG engaged these individuals in discourse, provided full and accurate information to them, which the individuals admitted they did not have, and ultimately proved each claim to be false.

85.    Upon information and belief, Bleeping and Quietman7, as prominent members of the anti-malware community in which this discourse played out, knew, recklessly disregarded, or should have known that ESG had already previously proved these claims to be false years before Quietman7 made them and used them as part of Bleeping's smear campaign against ESG for the purpose of building Bleeping's revenues.

86.    Bleeping, through its agents Quietman7 and other "staff" members, including other Global Moderators, has engaged repeatedly in the pattern and practice of referring to Bleeping's false, misleading and disparaging statements about ESG and SpyHunter4 each time a forum member mentions ESG or SpyHunter including, but not limited to, in response to user questions on March 18, 2015, March 27, 2015, April 24, 2015, July 19, 2015, October 28, 2015, October 29, 2015 and February 27, 2016.

87.     On January 26, 2015, in response to a question from a forum member about SpyHunter, Quietman7 directed the forum member to "please read this topic (http://www.bleepingcomputer.com/forums/t/550005/spyhunter-vs-malwarebytes-vs-iobit/#entry3491488) *for important information about SpyHunter and how to remove it.*"  Ex. 9 (emphasis added).  The cited topic contains false, misleading and disparaging statements about ESG and SpyHunter 4.

88.     In other posts on May 7, 2015, June 1, 2015, and October 31, 2015, Quietman 7 directed forum members to the same topic, adding that SpyHunter was "a dubious and ineffective program" that had "a history of employing aggressive and deceptive advertising" and/or that, if a user has used Spyhunter, "any detection results should be viewed with suspicion."  Ex. 10.

89.     After Bleeping spreads the false, misleading and disparaging statements about ESG and SpyHunter4, Bleeping instructs its users to "*remove*" SpyHunter and "*replace it*" with its affiliates' software, including Malwarebytes' software (emphasis added).

90.     Bleeping's instructions to its users are heeded -- in fact, Bleeping openly touts its influence on the purchasing decisions of its users.  After disparaging ESG and SpyHunter4, Quietman7 trumpeted that "[s]ince we [Bleeping] do not recommend this program [SpyHunter], I doubt that any of our members use it."

91.     To make it easy for users to replace SpyHunter4 with Malwarebytes' software and to earn its "Affiliate Commission" from Malwarebytes, Bleeping provides a single hyperlink for Malwarebytes' website that, when clicked, takes a user directly to the page where the user can click to purchase Malwarebytes' competing product.  Once purchased, Bleeping earns its "Affiliate Commission."

92.     To further influence its users to purchase Malwarebytes' products and not ESG products, Bleeping has removed links posted by users that suggest using an ESG product.  *See* Ex. 11.

93.     Upon information and belief, the Bleeping website hosts additional false, misleading and defamatory statements about ESG and SpyHunter made by Bleeping and its "staff" and third-party comments solicited by the false, misleading and defamatory statements made by Bleeping.

94.     Upon information and belief, Defendants Does 1-10 have carried out the aforesaid acts at the direction of, on behalf of, and with full knowledge of Bleeping.

95.     These postings by Defendants are all the more egregious as they represent a clear pattern and practice of making false and misleading claims, including unfounded, sensationalized claims of violations of consumer protection laws which can carry criminal penalties, over multiple topics, by multiple Bleeping staff members, in multiple areas of the forum.

96.     ESG has specifically requested Bleeping to cease and desist its unlawful conduct, but it has repeatedly refused to do so and continues to refuse to date.

97.     Bleeping not only has refused to take down the offending posts, but Bleeping, through at least Quietman7, has given permission to others to post and repost the false, misleading and disparaging information on other forums, including at least in February 2015, causing further harm to ESG.

98.     Defendants' conduct is willful and malicious.

99.     Defendants' unlawful conduct is causing and will continue to cause harm to ESG and its products.

100.    ESG has no adequate remedy at law for certain of the relief requested below.

18

## FIRST CAUSE OF ACTION

### (Violations of Lanham Act § 43(a))

101.   ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

102.   Defendants' use in commerce of false and misleading statements about ESG and SpyHunter constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

103.   Defendants' use in commerce of false and misleading statements about ESG and SpyHunter is likely to deceive consumers as to the nature, quality, and efficacy of ESG and SpyHunter, including causing consumers to believe that SpyHunter itself is a form of malware.

104.   Such deception is material as it is likely to influence consumers not to purchase SpyHunter and/or do business with ESG and instead to purchase products for which Bleeping gets a commission.

105.   Defendants' false and misleading statements have actually deceived or have the capacity to deceive a substantial portion of their intended audience, *i.e.*, users of the Bleeping Website who are potential customers of ESG and Malwarebytes.

106.   Defendants' false and misleading statements, which Bleeping deliberately repeatedly reposts and/or links to any time a new forum topic mentions or inquires about ESG, are part of an organized campaign by Bleeping to penetrate the market for anti-malware products to drive consumers away from ESG and to Malwarebytes, in order for Bleeping to earn commission on sales of Malwarebytes that it generated.

107.   As a direct and proximate result of Defendants' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury, including direct diversion of sales and a lessening of goodwill associated with its products, in amounts that will be proven at trial but that are believed to exceed $75,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION

### (Trade Libel/Commercial Disparagement)

108.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

109.    Defendants have maliciously published and disseminated false statements that disparage ESG and its SpyHunter product.

110.    These statements constitute injurious falsehoods and trade libel, which, *inter alia*, impugn the integrity of ESG and the quality and efficacy of SpyHunter.  These statements were expressly directed at ESG.

111.    Defendants have published and disseminated their false statements to the public by means of the Internet and specifically the Bleeping Website.

112.    There can be no question that the readers of Defendants' statements understand Defendants' defamatory meaning and understand that Defendants' statements are directed at ESG and its products.

113.    ESG has been specifically harmed by Defendants' defamatory statements.

114.    Defendants have no privilege or authorization to make their false and harmful statements.

115.    As a direct and proximate result of Defendants' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000, exclusive of interest and costs.

## THIRD CAUSE OF ACTION

### (Libel)

116.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

117.    Defendants' published and disseminated statements concerning ESG and SpyHunter are false and bring ESG into disrepute or contempt and impeach its integrity and reputation.  Specifically, Defendants assert, directly or by implication, *inter alia*, that ESG engages in "deceptive advertising which violates several consumer protection laws"; that ESG "has a history of employing aggressive and deceptive advertising"; and that SpyHunter 4 is a "rogue product."

118.    Defendants have published and disseminated their false statements to the public by means of the Internet and specifically, at least the Bleeping Website.

119.    Defendants are at fault because they intentionally, recklessly, or negligently made such statements.

120.    Defendants have no privilege or authorization to make such statements.

121.    ESG has been and continues to be damaged by these statements.

122.    ESG is a for-profit corporation, and Defendants' statements prejudice ESG in the conduct of its business and/or to deter others from dealing with it by discouraging potential customers from purchasing ESG products and encouraging them to purchase a competitor's products instead.

123.    As a direct and proximate result of Defendants' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury, including lost sales and/or refunds, in amounts that will be proven at trial but that are believed to exceed $75,000, exclusive of interest and costs.

## FOURTH CAUSE OF ACTION

(Libel *per se*)

124.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

125.    Defendants' published and disseminated statements tend to cause injury to ESG's profession and business because they reflect on ESG's performance and are incompatible with the proper conduct of ESG's business.

126.    Injury to ESG is a natural and proximate consequence of Defendants' *per se* libelous statements.

127.    As a result of this libel *per se*, ESG has suffered and will continue to suffer damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, ESG respectfully requests that the Court enter judgment in its favor as follows:

a.    Declaring that Defendants' conduct violates 15 U.S.C. § 1125(a);

b.    Declaring that Defendants' conduct constitutes trade libel and/or commercial disparagement under the laws of the State of New York;

c.    Declaring that Defendants' conduct constitutes libel and libel *per se* of a corporation under the laws of the State of New York;

d.    Permanently enjoining Defendants from publishing and disseminating the false advertising statements identified above in relation to ESG;

e.    Permanently enjoining Defendants from publishing and disseminating the statements constituting trade libel and/or commercial disparagement identified above in relation to ESG;

f.    Permanently enjoining Defendants from publishing and disseminating the statements constituting defamation of a corporation identified above in relation to ESG;

g.    Directing Defendants on the main page of the Bleeping Website to publish a retraction of the statements constituting false advertising, trade libel, commercial

disparagement and/or defamation of a corporation in relation to ESG;

        h.    Awarding ESG damages in an amount proven at trial and believed to be in

excess of $75,000, plus interest;

        i.    Awarding ESG its attorneys' fees and costs incurred in bringing this

action; and

        j.    Awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMANDED

ESG demands a trial by jury of all issues so triable in this action.

Dated:  New York, New York            Respectfully submitted,
         March 18, 2016

                       By:   /s/ Eric R.I. Cottle
                            Eric A. Prager (EP-0964)
                            Eric R. I. Cottle (EC-3234)
                            K&L GATES LLP
                            599 Lexington Avenue
                            New York, NY 10022
                            Telephone: 212.536.3900
                            Facsimile: 212.536.3901
                            eric.prager@klgates.com
                            eric.cottle@klgates.com

                            &

                            Terry Budd
                            Christopher M. Verdini
                            (*pro hac vice*)
                            K&L GATES LLP
                            210 Sixth Avenue
                            Pittsburgh, PA 15222
                            Telephone: 412.355.6500
                            Facsimile: 412.355.6501
                            terry.budd@klgates.com
                            christopher.verdini@klgates.com

                            *Attorneys for Plaintiffs*