UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ENIGMA SOFTWARE GROUP USA, LLC,

                                      Plaintiff,

                           -v-

BLEEPING COMPUTER LLC,

                                      Defendant.

------------------------------------------------------------------X

16 Civ. 57 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/8/16

PAUL A. ENGELMAYER, District Judge:

      This lawsuit by a computer software company seeks redress for critical statements about it and its flagship product that were posted on a computer support website. Plaintiff Enigma Software Group USA, LLC ("ESG") develops and markets computer security products, including SpyHunter, its leading anti-malware program. Defendant Bleeping Computer LLC ("Bleeping") owns and operates http://www.bleepingcomputer.com, a computer support website. ESG alleges that Bleeping has perpetrated a "smear campaign" against ESG, which has entailed publishing false, defamatory statements about ESG and SpyHunter in order to divert sales from ESG to its competitors, from whom Bleeping receives commissions. ESG brings claims against Bleeping for defamation and trade libel, in violation of New York law, and false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

      Bleeping now moves to dismiss the Second Amended Complaint ("SAC") under Federal Rule of Civil Procedure 12(b)(6) on various grounds. For the reasons that follow, that motion is granted in part and denied in part.

# I.    Background

## A.    Factual Background[1]

ESG is a Florida limited liability company that develops and markets computer security products.  SAC ¶¶ 16, 21.  It specializes in anti-malware products, *i.e.*, those that protect against "malicious software," such as "viruses and spyware that can steal personal information, send spam, and commit fraud."  *Id.* ¶¶ 21–23.[2]  SpyHunter, an "adaptive malware detection and removal tool," is ESG's flagship anti-malware product.  *Id.* ¶¶ 24–26.  Consumers can download a free scanning version of SpyHunter through a link on ESG's website.  *Id.* ¶ 27.  The scanner detects whether a computer has malware or other security threats.  *Id.*  Through ESG's website, consumers can also buy a license to the full version of SpyHunter.  *Id.* ¶ 28.  That version includes the scanner, as well as tools to remove malware and other security protection tools.  *Id.*

Bleeping operates a website, http://www.bleepingcomputer.com, which offers information, advice, and resources about computer technology and security.  *See id.* ¶¶ 2–3, 32–34.  Anti-malware software is a focus of Bleeping's coverage.  *Id.* ¶ 5.  Bleeping generates profits through its "Affiliate" program, under which it receives commissions from designated "Affiliate" software companies for promoting their products on its website.  *Id.* ¶¶ 7–8, 43.

---

[1] The facts related herein are drawn primarily from the SAC, Dkt. 25 ("SAC"), and the attached exhibits.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  The Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in ESG's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  For context, the Court also cites here representations made by counsel at argument on June 6, 2016.  Dkt. 43 ("Tr.").

[2] Spyware is a "type of malware that can monitor or control your computer use.  It may be used to send consumers pop-up ads, redirect their computers to unwanted websites, monitor their Internet surfing, or record their keystrokes, which, in turn, could lead to identity theft."  SAC ¶ 22.

Under that program, Bleeping posts "Affiliate Links" throughout its website which redirect users to third-party webpages where they can buy Affiliate products.  *Id.* ¶¶ 8, 35–36.  Bleeping earns a commission whenever a user clicks on an Affiliate link and buys an Affiliate product.  *Id.* ¶ 37.

The Bleeping website includes a "Forums" section where Bleeping offers advice and answers users' questions about topics related to computer security and technology.  *Id.* ¶¶ 34, 41.  Bleeping manages the Forums through a hierarchy of "member groups," comprised of "staff members" who are appointed to "generate and control [the] content" posted therein.  *Id.* ¶¶ 45, 54, 60.  The third-highest "member group" is made up of "Advisors," whom Bleeping holds out as experts who "can be trusted to give correct and understandable answers to [users'] questions."  *Id.* ¶¶ 50–51.  Above Advisors are "Global Moderators," who enjoy "special powers" to enforce rules governing the Forums, *e.g.*, by "closing" discussions, editing the content of users' posts, and suspending the posting privileges of users who violate the rules.  *Id.* ¶¶ 48–49.  Finally, Lawrence Abrams, Bleeping's owner, occupies the highest member group as the overall "Admin" of the Forums.  *Id.* ¶ 47.  Abrams has the "final say when appointing all other staff positions."  *Id.*

Whenever an Advisor, Global Moderator, or Admin posts in Bleeping's Forums, "Bleeping clearly identifies that the post has been made by [a Bleeping staff member]."  *Id.* ¶ 53.[3]  Because Bleeping touts its staff as experts who can be "trust[ed] to provide correct, unbiased and truthful advice," *id.* ¶¶ 3, 32, the SAC alleges, users rely on their advice when making purchasing decisions regarding anti-malware products, *id.* ¶¶ 4, 6, 79.  However, the

---

[3] Bleeping also "provides its members with a 'current list' of the individuals who are in each 'member group' and informs users of its website about the 'member group' status of such persons when they post information on Bleeping's [F]orums, including whether they are a designee to act on behalf of Bleeping."  SAC ¶ 46.

SAC alleges, Bleeping's staff members "do not[, in fact,] provide such unbiased advice." *Id.*
¶ 33. Rather, "[u]nder the guise of giving 'correct and understandable answers,' [they] purposely
push[] users away from anti-malware products for which [Bleeping] does not receive
commissions and toward specific anti-malware products for which it receives sales
commissions." *Id.* ¶ 7; *see also id.* ¶ 33.

Bleeping does not receive commissions from ESG on sales of SpyHunter or any of its
other products. *Id.* ¶ 11. But, it does have an Affiliate arrangement with Malwarebytes, a direct
competitor of ESG. *Id.* ¶ 10; *see also id.* ¶ 44 ("Bleeping functions as a sales arm of
Malwarebytes."). On that basis, the SAC alleges, "Bleeping has a direct financial interest in
driving traffic and sales to Malwarebytes and . . . away from ESG." *Id.* ¶ 12. "To further that
interest," it alleges, Bleeping "has adopted and employed a pattern of making[, in its Forums
posts,] false, inaccurate, misleading and disparaging statements about ESG and [SpyHunter] . . .
while simultaneously recommending . . . Malwarebytes[' anti-spyware product, Malwarebytes
Anti-Malware]." *Id.* ¶ 13; *see also id.* ¶¶ 75–78. "To make it easy for users to replace
SpyHunter[] with [Malwarebytes Anti-Malware] and to earn its [commission]," the SAC alleges,
Bleeping includes in such posts Affiliate Links through which users can purchase Malwarebytes
Anti-Malware. *Id.* ¶ 91. Additionally, the SAC alleges, Bleeping routinely removes links posted
by users that endorse ESG's products. *Id.* ¶ 92.

The SAC alleges that Quietman7, a Bleeping Advisor and one of only three Global
Moderators, is a chief spokesperson for Bleeping's "smear campaign" against ESG. *See id.*
¶¶ 65–76. In that role, the SAC alleges, whenever a forum member mentions or inquires about
ESG or SpyHunter, Quietman7 responds by making false, disparaging statements about ESG and
SpyHunter and/or directing users to past posts containing such statements. *See id.* ¶¶ 86–88.

The SAC identifies 13 such posts published on various dates between December 10, 2013 and October 31, 2015. *See id.* ¶¶ 80, 86–88; *id.*, Exs. 6–11. In them, the SAC alleges, Quietman7 made false and misleading statements that "impugn the integrity of ESG and the quality and efficacy of SpyHunter." *Id.* ¶ 110. Concretely, the SAC alleges, Quietman7 stated, directly or by implication, that: (1) ESG engages in aggressive and deceptive advertising; (2) SpyHunter is a "dubious" and "ineffective" program that generates false positives; and (3) SpyHunter is a "rogue" product that is properly classified as malware, rather than the *anti*-malware product it purports to be. *See id.* ¶¶ 103, 117; *id.*, Ex. 7, at 2, 4; *id.*, Ex. 8, at 3; *id.*, Ex. 10, at 3, 10, 13–14; *id.*, Ex. 11, at 5. In the same posts, the SAC alleges, Quietman7 advised users to remove SpyHunter and replace it with a more "trustworthy" alternative—invariably an Affiliate product, such as Malwarebytes Anti-Malware, for which he supplied an Affiliate Link. *Id.* ¶ 89.[4]

The SAC alleges that Bleeping has considerable influence over its users, who heed its advice when making purchasing decisions. *Id.* ¶ 90; *see also, e.g.*, *id.*, Ex. 10, at 11 (user response to Quietman7's 6/1/2015 post: "K, thanks . . . . I'm convinced. Will buy a more trustworthy product when [SpyHunter] expires."). Accordingly, the SAC alleges, as a result of Bleeping's conduct, ESG has suffered significant monetary and reputational injury, including direct diversion of sales and a lessening of goodwill associated with its products. *Id.* ¶¶ 107, 115, 123, 127.

---

[4] *See, e.g.*, SAC, Ex. 6, at 4 (9/28/14 post in "spyhunter vs Malwarebytes vs iobit" forum topic: "If you have downloaded and scanned with SpyHunter, detection results should be analyzed carefully before you remove anything. Based on this information, it is in my opinion that you remove this program and replace it with highly regarded alternatives such as Malwarebytes Anti-Malware or Emsisoft Anti-Malware."). The SAC alleges that Emsisoft is another Affiliate that pays Bleeping commissions. *Id.* ¶ 42.

### B.    Procedural History

On January 5, 2016, ESG filed the original Complaint.  Dkt. 1.  On January 8, 2016, ESG filed the First Amended Complaint ("FAC").  Dkt. 6.  On February 26, 2016, Bleeping filed a motion to dismiss the FAC.  Dkt. 16.

On March 18, 2016, ESG filed the SAC.  Dkt. 25.  It brings claims for (1) libel; (2) libel *per se*; (3) trade libel/commercial disparagement; and (4) false advertising, in violation of § 43(a) of the Lanham Act.  SAC ¶¶ 101–27.  It seeks (1) declaratory relief; (2) an injunction barring Bleeping from publishing actionable statements about ESG and directing it to publicly retract the offending statements; (3) damages; and (4) attorneys' fees and costs.  *Id.* at 22–23.

On April 8, 2016, Bleeping filed a motion to dismiss the SAC, Dkt. 28, along with a memorandum of law, Dkt. 32 ("Def. Br."), and an affidavit by its counsel, Dkt. 29, in support. On April 22, 2016, ESG filed a brief in opposition, Dkt. 32 ("Pl. Br."), along with a declaration by ESG's counsel, Dkt. 31 ("Prager Decl."), and attached exhibits.  On April 29, 2016, Bleeping replied.  Dkt. 35 ("Def. Reply Br.").  On June 6, 2016, the Court heard argument.  *See* Tr.

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)).   However, this tenet is "inapplicable to legal conclusions."   *Iqbal*, 556 U.S. at 678.   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible."   *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).   A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."   *Twombly*, 550 U.S. at 558.

## III.   Discussion

ESG brings claims against Bleeping for libel, libel *per se*, and trade libel, under New York law ("state-law claims"), and for false advertising, under § 43(a) of the Lanham Act. Bleeping moves to dismiss on the grounds that (1) the Communications Decency Act, 47 U.S.C. § 230 ("CDA" or "Section 230"), shields it from liability; (2) ESG's claims are time-barred; and (3) the SAC fails to state a claim.

The ensuing analysis proceeds as follows:  The Court first addresses, and rejects, Bleeping's threshold arguments that ESG's claims are barred by the CDA and the applicable statutes of limitations.  The Court then considers Bleeping's substantive challenges to each claim.

A.      **Threshold Questions: Immunity and Timeliness**

1.      **Does the Communications Decency Act Bar ESG's Claims?**

Section 230(c) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Section 230(e) states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).  Accordingly, a defendant is immune from liability if: "(1) it is a 'provider or user of an interactive computer service';[5] (2) the complaint seeks to hold the defendant liable as a 'publisher or speaker'; and (3) the action is based on 'information provided by another information content provider.'"[6]  *Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281, 286 (2011) (quoting 47 U.S.C. § 230(c)(1)) (collecting cases); *accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 548 (E.D. Va. 2008), *aff'd*, 591 F.3d 250 (4th Cir. 2009).

ESG does not dispute that Bleeping is an ICS under the statute, and websites clearly so qualify.[7]  Nor does it dispute that its state-law claims—defamation and trade libel—"clearly seek

---

[5] The statute defines "interactive computer service" ("ICS") as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."  47 U.S.C. § 230(f)(2).

[6] The statute defines "information content provider" ("ICP") as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).

[7] *See, e.g.*, *Nemet Chevrolet*, 591 F.3d at 255 (www.consumeraffairs.com was ICS); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) ("Today, the most common interactive computer services are websites."); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011) (consumer review website www.pissedconsumer.com was ICS).

to hold [Bleeping] liable as [a] publisher[] and speaker[]." *Shiamili*, 17 N.Y.3d at 290.  Rather, it argues that § 230 does not shield Bleeping from liability because: (1) the CDA does not apply to claims brought under the Lanham Act; and (2) in any event, it was Bleeping—not a third-party ICP—that "provided" the allegedly offending content.

As to ESG's first argument, § 230(e)(2) states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property."  47 U.S.C. § 230(e)(2). A court in this District has held that this language precludes immunity for claims brought under § 43(a) of the Lanham Act.  *See Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001); *see also Ford Motor Co. v. GreatDomains.com, Inc.*, No. 00 Civ, 71544 (DT), 2001 WL 1176319, at *1 (E.D. Mich. Sept. 25, 2001) (same).  Bleeping neither disputes this construction nor identifies contrary case law.  *See* Def. Reply Br. 1–2.  On the basis of the statutory text, the Court, therefore, holds that the CDA does not bar ESG's Lanham Act claim.

As to ESG's second argument, it is well established that, for an ICS to enjoy immunity under CDA § 230, a *different* ICP must have provided the complained-of information—the statute does "not immunize [defendants] with respect to any information [they] developed or created entirely by [themselves]."  *Doe v. City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008); *accord Carafano v. Metrosplash.com., Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); *Ascentive*, 842 F. Supp. 2d at 474; *Shiamili*, 17 N.Y.3d at 289.  Here, ESG argues that Bleeping was the ICP of the allegedly offending statements because, on the facts pled, Quietman7 was acting as Bleeping's agent when he posted them.[8]

---

[8] This case is thus distinguishable from the cases cited by Bleeping, where, on the facts pled, the defendant website operator had performed only "traditional editorial functions" with respect to content that was created by third-party ICPs.  *See, e.g.*, *Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 541 (2015) (defendant immune under CDA notwithstanding allegations that it filtered users' reviews, because "[s]uch activities

The Court agrees that the factual allegations, which must be credited on a motion to dismiss, are sufficient, under principles of agency, to make Bleeping the provider of the challenged statements about ESG and SpyHunter.  Under New York law, an express agency is created through (1) "the principal's manifestation of intent to grant authority to the agent," (2) "agreement by the agent," and (3) the principal's "control over key aspects of the undertaking." *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (collecting cases).  Even where there is no "actual" authority, an implied agency is created where the principal's conduct, "reasonably interpreted, causes [ ] third [parties] to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."  *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir. 1990); *accord Dinaco, Inc. v. Time Warner Inc.*, 98 Civ. 6422 (JSM), 2002 WL 31387265, at *3 (S.D.N.Y. Oct. 22, 2002), *aff'd*, 346 F.3d 64 (2d Cir. 2003) (implied agency exists where principal is "responsible for [the agent's] appearance of authority and . . . [the third party's] reliance on the appearance of authority was reasonable").

Here, the SAC alleges that Bleeping publicly designated Quietman7 as a "Global Moderator" and "Advisor"—the second and third highest "staff member" positions within the

---

constitute traditional editorial functions that do not render Yelp an [ICP]"); *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (defendant not ICP where he "did no more than select and make minor alterations" to content posted by third parties); *Ascentive*, 842 F. Supp. 2d at 476 (consumer review website's acts of inviting consumers to post complaints on website, and prominently displaying such complaints, did not render it an ICP); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833 (3d Cir. 2007) (Google held immune under CDA because "[i]n each instance raised by Plaintiff's tort claims, Google either archived, cached, or simply provided access to content that was created by a third party"); *Shiamili*, 17 N.Y.3d at 286 (section 230 barred plaintiff's claim "because the complaint [did] not allege that defendants authored the defamatory content, but only that they published and edited it").

Bleeping member group hierarchy.  SAC ¶¶ 48–51, 60, 65–67, 69.[9]  It alleges that Quietman7 publicly accepted these appointments, and has since signed his posts as "Bleepin' Janitor" and "The BC Staff."  *Id.* ¶¶ 70–72.  Further, as alleged in the SAC, Bleeping staff members are "authorized [ ] and expected to post in Bleeping's forums," and "direct[ed] . . . to recommend and promote certain products for which [Bleeping] receives commissions . . . and to discourage use of other products from which it does not receive commission."  *Id.* ¶¶ 53, 62.  Bleeping's Advisors are touted as experts who "can be trusted to give correct and understandable answers to [Bleeping's] member's [sic] questions."  *Id.* ¶ 51 (quoting Bleeping website).  And Global Moderators are alleged to enjoy even greater authority:  They are authorized "to enforce the rules of the Bleeping Computer Forums," to "answer questions (or help people with problems)," and to suspend forum posting privileges of members who violate forum rules.  *Id.* ¶ 49 (quoting Bleeping website).

These allegations plausibly support the conclusion that Quietman7 was acting, at a minimum, as Bleeping's implied agent when he posted the allegedly offending content.  *See Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344–45 (S.D.N.Y. 2010) ("[T]o survive a motion to dismiss . . . , a plaintiff need only raise[] a sufficient inference that some sort of agency relationship existed between the purported principal and agent. . . .  [W]here the circumstances alleged in the pleading raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency are issues for the jury." (internal quotation marks and citations omitted)).  By holding Quietman7 out

---

[9] The SAC alleges that Quietman7 was appointed as an Advisor in March 2006, SAC ¶¶ 66–68, and as a Global Moderator in September 2007, *id.* ¶¶ 69–70.

as a staff member who enjoyed the "special powers" of an Advisor and Global Moderator,[10] and

who could be "trusted to give correct . . . answers" to users' questions, *see* SAC ¶¶ 3, 49, 51,

Bleeping represented to its users that Quietman7 was authorized to post on its behalf.[11]   Users

could have reasonably relied on this representation.   *See Capitol Records, LLC v. Vimeo, LLC*,

972 F. Supp. 2d 500, 518–19 (S.D.N.Y. 2013) (triable issue of fact existed as to whether

employee-uploaders were acting as website's agents, where uploaders served as "editorial voice"

---

[10] Based on Quietman7's later appointment to the higher position of Global Moderator, Bleeping argues that he was no longer an Advisor at the time he published the posts recited in the SAC. Def. Br. 6 n.4; Def. Reply Br. 1–2.   However, nothing in the SAC or its cognizable attachments suggests that Quietman7 was ever stripped of his "Advisor" authority or his designation as an "expert."   Therefore, drawing all reasonable inferences in ESG's favor, the Court concludes that Quietman7 was acting in his capacity as both an Advisor and a Global Moderator when he posted the challenged statements.

[11] Bleeping cites several cases for the proposition that a person's "moderator" status, without more, does not render a website operator liable for his conduct.   *See* Def. Br. 7 (citing *Internet Brands, Inc. v. Jape*, 328 Ga. App. 272 (2014); *Stevo Design, Inc. v. SBR Mktg., Ltd.*, 919 F. Supp. 2d 1112 (D. Nev. 2013); *Higher Balance, LLC v. Quantum Future Group, Inc.*, No. 08 Civ. 233 (HA), 2008 WL 5281487 (D. Or. Dec. 18, 2008); *Shiamili*, 17 N.Y.3d 281).   But ESG's claim of agency is not predicated on Quietman7's designation as a generic "moderator."   Rather, it is based on his designation as a "staff member," the special authority he enjoys as an Advisor and Global Moderator, and the representations Bleeping has made regarding staff members who hold those titles.   *See* Pl. Br. 8.   This case is thus afar from those on which Bleeping relies, where the moderators either enjoyed limited powers or did not themselves author the offending posts. *See Internet Brands*, 328 Ga. App. at 274 (author of offending post authorized only to "delete spam posts"); *Stevo Design*, 919 F. Supp. 2d at 1126 (website had "passive message boards" on which users posted content, "with only occasional curation by message board moderators") (internal quotation marks omitted); *Higher Balance*, 2008 WL 5281487, at *7 (plaintiff failed to show moderators were "staff members" or otherwise agents); *Shiamili*, 17 N.Y.3d at 286 ("complaint . . . [did] not allege that [moderators] authored the defamatory content, but only that they published and edited it").

Moreover, the fact that Quietman7 may have been a "volunteer" does not, as Bleeping argues, negate his status as Bleeping's agent.   *See* Def. Br. 6 (citing statement on Bleeping website that "the staff are all volunteers").   New York courts have repeatedly held volunteers to be agents where the common law requirements for agency were met.   *See, e.g.*, *Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (2d Dep't 2007); *Robinson v. Downs*, 834 N.Y.S.2d 770, 771 (4th Dep't 2007).

for website and website posted "staff badge" next to uploaders' names on their posts); *Columbia Pictures Indus., Inc. v. Fung*, No. 06 Civ. 5578 (SVW), 2009 WL 6355911, at *13 n.21 (C.D. Cal. Dec. 21, 2009) (websites liable for moderators' infringements, despite lack of evidence of actual authority, where "websites' act of designating them as 'moderators' and providing them with specific forum-related powers [could] lead[] a 'third party reasonably [to] believe[ ] the [moderators] ha[d] authority to act on behalf of the [website]") (internal quotation marks and citation omitted), *aff'd in part and modified on other grounds*, 710 F.3d 1020 (9th Cir. 2013).

Because the SAC adequately pleads that Quietman7 acted as Bleeping's agent, he does not qualify as a third-party ICP under the CDA so as to entitle Bleeping to immunity.  Section 230, therefore, does not bar ESG's claims.  *See Alvi Armani Medical, Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (dismissal on § 230 grounds inappropriate where plaintiffs alleged that defendant "itself created tortious content . . . through its agents"); *Higher Balance*, 2008 WL 5281487, at *7 (§ 230 immunity would not apply if plaintiffs showed that forum moderators were agents or employees of defendants); *Anthony v. Yahoo Inc.*, 421 F. Supp. 2d 1257, 1262–63 (N.D. Cal. 2006) (Yahoo! not immune under § 230 from claims that company itself created false profiles).

### 2.    Are ESG's Claims Time-Barred?

Bleeping argues that ESG's claims are time-barred because (1) they are subject to a one-year limitations period, and (2) "[n]early all" the statements that underlie them were published more than one year before the initial Complaint was filed.  Def. Br. 9.  The Court assesses the timeliness of ESG's state-law and Lanham Act claims in turn.

#### a.    State-Law Claims

New York law sets a one-year statute of limitations for defamation and trade libel claims. N.Y. C.P.L.R. § 215(3).  Under the "single publication rule," the publication of a defamatory

statement—however widespread its distribution—is "in legal effect, one publication which gives rise to one cause of action," with the limitations period running from the date of publication. *Gregoire v. Putnam's Sons*, 298 N.Y. 119, 123 (1948).  The New York Court of Appeals has extended this rule to online publications.  *See Firth v. State*, 98 N.Y.2d 365, 370 (2002); *Martin v. Daily News L.P. (Martin II)*, 990 N.Y.S.2d 473, 483 (1st Dep't 2014) ("This rule applies to publications on the Internet . . . so continuous access to an article posted via hyperlinks . . . is not a republication.") (citation omitted).  However, if a defamatory comment is "republished" in a new format, the statute of limitations begins to run anew from the date of republication.  *Firth*, 98 N.Y.2d at 371.  The New York Court of Appeals has explained that republication "occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition," and which is intended to reach a "new audience."  *Id.* (internal quotation marks and citation omitted).

Here, the 13 posts that supply the basis for ESG's claims were published on various dates between December 10, 2013 and October 31, 2015.  *See* SAC ¶¶ 80, 86–88; *id.*, Ex. 6, at 3–4, 7, 9; *id.*, Ex. 7, at 2–3, 4, 5; *id.*, Ex. 8, at 3; *id.*, Ex. 9, at 3–4; *id.*, Ex. 10, at 3, 10, 13–14; *id.*, Ex. 11, at 5.  Of those, eight were posted within one year of the initiation of this action—*i.e.*, on or after January 5, 2015.  *See id.*, Ex. 6, at 7, 9; *id.*, Ex. 7, at 5; *id.*, Ex. 9, at 3–4; *id.*, Ex. 10, at 3, 10, 13–14; *id.*, Ex. 11, at 5.  Each of those includes a hyperlink to a previous post published by Quietman7 on September 28, 2014, in a forum topic entitled "spyhunter vs Malwarebytes vs iobit" (the "2014 Post").  *Id.*, Ex. 6, at 3–4.

Bleeping argues that merely hyperlinking to the 2014 Post does not create a republication that retriggers the limitations period, and, therefore, that any claims predicated on posts in which Quietman7 refers readers to the 2014 Post via hyperlink are time-barred.  Def. Br. 9.

Bleeping's argument fails because four post-January 5, 2015 posts go beyond merely hyperlinking to the 2014 Post: They contain additional statements which ESG alleges are themselves defamatory. For instance, Quietman7's October 31, 2015 post in the "HTML/RCE.Gen3 Virus" forum topic reads, in pertinent part, as follows:

> SpyHunter by Enigma Software Group USA, LLC is a dubious program and detection results should be analyzed carefully before you remove anything. When searching for malware removal assistance (and removal guides) on the Internet, it is not unusual to find numerous hits from untrustworthy and scam sites which mis-classify detections or provide misleading information. This is deliberately done more as a scam to entice folks into buying an advertised fix or using a questionable removal tool. SpyHunter . . . , a dubious and ineffective program with a history of employing aggressive and deceptive advertising is one of the most common "so-called" removal tools pushed by these sites. Please read this topic [the 2014 Post] for important information about SpyHunter.

SAC, Ex. 10, at 13–14; *see also id.*, Ex. 10, at 3, 10; *id.*, Ex. 11, at 5.

Because at least some of the allegedly defamatory statements fall within the limitations period, ESG's state-law claims cannot be dismissed as untimely. *See Ullah v. NYC Dep't of Educ.*, No. 11 Civ. 3868 (GBD), 2012 WL 4471533, at *4 (S.D.N.Y. Sept. 27, 2012) (denying motion to dismiss on statute-of-limitations grounds where "[p]laintiff . . . alleged at least some discriminatory conduct which falls within the statute of limitations"); *Benhur v. Madavaram*, No. 15 Civ. 6826, 2015 WL 6739109, at *3 (D.N.J. Nov. 2, 2015) ("As at least some of Plaintiff's [defamation] claims are not barred by the statute of limitations, the count will not be dismissed on this basis."); *Doolittle v. Ruffo*, No. 88 Civ. 1175 (NPM), 1996 WL 159850, at *15 (N.D.N.Y. Mar. 27, 1996) ("[I]n order to withstand a given defendant's motion, each plaintiff must demonstrate that *at least some of that given defendant's conduct* occurred within the . . . statute of limitations period." (emphasis added)).

In light of this holding, the Court has no occasion to determine, at this stage, whether any of Quietman7's post-January 5, 2015 posts amount to a republication of the 2014 Post (thus

making the material first published in the 2014 Post potentially actionable).  However, because

this issue, which presents a question requiring close textual and contextual analysis, is apt to

resurface later in this litigation, the Court offers the following observations on arguments the

parties have made.

Bleeping cites a number of cases for the proposition that hyperlinking to an earlier-

published article does not amount to a republication of that article.  But those cases arise in a

context different from that here.  There, the hyperlinks were either posted without commentary

or accompanied by a reference that did not restate the allegedly defamatory content.  *See, e.g.*, *In*

*re Philadelphia Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) (mere reference to an

article, "*as long as it does not restate the defamatory material*, does not republish the material")

(emphasis added); *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009)

("[A] reference, without more, is not properly a republication[, because . . . w]hile it may call the

*existence* of the article to the attention of a new audience, it does not present the *defamatory*

*contents* of the article to that audience.") (emphasis in original).  By contrast, here, as alleged, at

least two of Quietman7's timely posts themselves restate, almost verbatim, allegedly defamatory

statements from the 2014 Post, and only then do they direct users to read the 2014 Post for

additional, similar information.  *See* SAC, Ex. 10, at 3, 10.[12]  The cases on which Bleeping relies

---

[12] The May 7, 2015 post in the "New PClock CryptoLocker Ransomeware discovered" forum
topic, and the June 1, 2015 post in the "Rogue partition driving me insane!!!" topic, each states,
in pertinent part:

> When searching for malware removal assistance (and removal guides) on the
> Internet, it is not unusual to find numerous hits from untrustworthy sources and
> scam sites which mis-classify detections or provide misleading information.  This
> is deliberately done more as a scam to entice folks into buying an advertised fix or
> using a questionable removal tool.  SpyHunter (SpyHunter-Installer.exe), a
> dubious and ineffective program from Enigma Software Group (ESG) with a
> history of employing aggressive and deceptive advertising is one of the most
> common 'so-called' removal tools pushed by these sites.

are therefore inapposite, as they do not address whether, under these circumstances, Quietman7's

hyperlinking to the 2014 Post amounts to a republication.  *See Martin v. Daily News, L.P.*

*(Martin I)*, 951 N.Y.S.2d 87 (Sup. Ct. N.Y. Cty. 2012) (table decision) ("Whether a particular

event constitutes a republication giving rise to a new cause of action with a refreshed limitations

period must be analyzed on a case-by-case basis."), *aff'd*, *Martin II*, 990 N.Y.S.2d 473.

In contrast, ESG cites to cases "where substantive material [was] added to a website, and

that material [was] related to defamatory material that [was] already posted."  *In re Davis*, 347

B.R. 607, 612 (W.D. Ky. 2006).  For instance, in *Larue v. Brown*, 333 P.3d 767, 773 (Ariz. Ct.

App. 2014), the court held that there was republication when the author of an online article

responded to reader comments by re-urging the truth of the article and posting additional

substantive information.  Similarly, in *In re Davis*, 347 B.R. at 611–612, the court held that

---

> Please read this <u>topic</u> [the 2014 Post] for more important information about
> SpyHunter.

SAC, Ex. 10, at 3, 10.

By way of comparison, the 2014 Post states, in pertinent part:

> SpyHunter by Engima Software Group USA, LLC is a program that was
> previously listed as a rogue product on the Rogue/Suspect Anti-Spware Products
> List because of the company's history of employing aggressive and deceptive
> advertising.  It has since been delisted but some users have reported they still
> engage in deceptive advertising. . . .
>
> * * *
>
> Further, when searching for new malware or malware removal assistance (and
> removal guides) on the Internet, it is not unusual to find numerous hits from
> untrustworthy sites that provide inadequate removal instructions and then offer a
> tool that a visitor must purchase before it removes anything.  These sites
> recommend a pay-to-clean program, rather than a free-to-clean program, because
> the site owner will make a commission on the sale of the program.  SpyHunter
> (SpyHunter-Installer.exe) is one of the most common removal tools pushed by
> these sites.

*Id.*, Ex. 6, at 3–4.

defendants had republished a website containing allegedly defamatory material when they updated it to add "Breaking News!" and "Update!" sections which "list[ed] additional nefarious activities in which [the plaintiffs were] . . . alleged to have participated."  "To hold otherwise," the court explained, "would give a publisher *carte blanche* to continue to publish defamatory material on the Internet after the statute of limitations has run in the first instance."  *Id.* at 612. These cases appear factually closer to the fact pattern alleged in the SAC and its attachments.  To the extent the issue of whether a hyperlink to a prior post constitutes republication is the subject of future briefing, counsel, in citing case law, should be mindful of the specific factual context in which the hyperlinking is shown to have occurred.[13]

---

[13] ESG makes a separate argument: that the 2014 Post was republished by virtue of Bleeping's later (post-January 5, 2015) alterations of that post.  *See* Pl. Br. 24–25.  That argument, however, is not persuasive.  Where an author or publisher makes substantive, not technical, modifications to an online post, it may constitute a republication.  *See Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013); *In re Davis*, 347 B.R. at 612.  But, here, the cognizable materials reveal that the only modification to the 2014 Post within the limitations period was the addition of a single link to its reference section.  *See* SAC, Ex. 6, at 5; Pl. Br., Ex. 2.  ESG does not explain why such an alteration is a "material[] change[]" to the original post.  *Pearce v. Manhattan Ensemble Theater, Inc.*, No. 06 Civ. 1535 (KMW), 2009 WL 3152127, at *8 n.7 (S.D.N.Y. Sept. 30, 2009); *see Martin I*, 951 N.Y.S.2d 87 (addition of "share buttons" to online article did not constitute republication); *Churchill v. State of New Jersey*, 378 N.J. Super. 471, 477 (App. Div. 2005) (technical changes to website, such as addition of button on menu bar linking to report, did not constitute republication).

The Court is similarly unpersuaded that Quietman7's act of hyperlinking to the 2014 Post in separate forum topics on the Bleeping website was akin to posting it on an entirely separate website, thereby republishing it to "new audience."  *Compare Firth v. State of New York*, 761 N.Y.S.2d 361, 362 (3d Dep't 2003) ("[C]laimant's allegations that the report was moved to a different Internet address are sufficient to state a cause of action for republication to a new audience akin to the repackaging of a book from hard cover to paperback."), *with Martin II*, 990 N.Y.S.2d 473, 484 (restoration of article to website on which it was originally published was "not geared toward reaching a new audience" and was "akin to a delayed circulation of the original"), *and Salyer*, 701 F. Supp. 2d at 917 (although reposting article on same website made it easier for website visitors to access, it did not amount to republication before a new audience).

### b.    Lanham Act Claim

Because the Lanham Act does not have its own statute of limitations, the Court "must look to the analogous State law to determine the limitations period which does best to further the policies behind the Act." *Mario Valente Collezioni, Ltd. v. AAK Ltd.*, 280 F. Supp. 2d 244, 257 (S.D.N.Y. 2003) (internal quotation marks and citation omitted).  As the Second Circuit has observed, "virtually every district court in this Circuit that has addressed the question [has held] that a six year fraud statute" applies to false advertising claims brought under § 43(a) of the Lanham Act.  *Conopco*, *Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *accord Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1529 (S.D.N.Y. 1994) (collecting cases).  The rationale of these decisions is that § 43(a) "applies . . . to those deceptive business practices which, like trademark infringement, attempt to induce consumers to purchase an advertiser's goods by falsely passing them off as the same as, or better than[,] those of a competitor.  Such claims can best be analogized to causes of action sounding in fraud." *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F. Supp. 196, 199 (S.D.N.Y. 1984).

In the face of this precedent, Bleeping argues that a one-year limitations period should apply here because ESG's Lanham Act claim—that Bleeping damaged ESG's reputation by making disparaging comments about its business practices and product—is akin to a defamation claim.  Def. Br. 9–10.  That argument is not persuasive.

Bleeping fails to identify any case applying a defamation statute of limitations to a Lanham Act claim.  *See* Tr. 16–17 (Bleeping's counsel: "I don't even have an obscure case for you.").  And its statement that "[t]his is a defamation claim poorly disguised as a Lanham Act claim" oversimplifies ESG's claim.  Def. Br. 10; *see also* Tr. 19 ("We are [ ] only here because they are complaining about damage to their reputation. . . .  [S]o that's why I [ ] think it's a defamation claim dressed up as a Lanham Act claim.").  ESG does not merely allege that

Bleeping made false and disparaging statements about it and SpyHunter.  It claims that Bleeping mounted an organized "smear campaign" against ESG, designed to mislead consumers as to the relative merits of SpyHunter and Malwarebytes Anti-Malware, in order to divert sales from ESG to Malwarebytes, from whom it receives commissions.  *See* SAC ¶¶ 85, 106.  In this light, ESG's Lanham Act claim has significant echoes of a fraud claim.  *See PepsiCo*, 578 F. Supp. at 199.

Based on the pleadings, therefore, the Court declines to stray from "the body of cases holding that the [six-year] statute of limitations [for] New York state fraud claims" applies to claims brought under the Lanham Act.  *Mario Valente Collezioni, Ltd.*, 280 F. Supp. 2d at 258. Because each of Quietman7's allegedly unlawful statements was made well within this period, ESG's Lanham Act claim is, also, timely.[14]

**B.      Whether the SAC States a Claim**

Having held that ESG's claims are barred neither by the CDA nor the governing statutes of limitations, the Court turns to Bleeping's challenges to ESG's pleadings as to the elements of those claims.

**1.      Has ESG Stated a Claim for Defamation?**

The SAC brings claims for libel and libel *per se* (collectively, the "defamation claims"), alleging that Bleeping published statements about ESG and SpyHunter that are false, bring ESG into disrepute or contempt, impeach its reputation, and cause injury to its business and profession.  *See* SAC ¶¶ 117–27.  The gravamen of these claims is that Bleeping, through Quietman7, falsely represented that: (1) ESG engages in unlawful, deceptive pricing and advertising; and (2) SpyHunter is an ineffective, "rogue" product, more akin to malware than the *anti*-malware product it purports to be.

---

[14] Even if the Court applied a one-year limitations period, the result would not change—as with ESG's state-law claims, some underlying statements were made within a year of this lawsuit.

To state a claim for defamation under New York law, a plaintiff must allege that the defendant made a statement that was: (1) false, defamatory, and of and concerning the plaintiff; (2) published to a third party; (3) made with the applicable level of fault; and (4) defamatory *per se* or caused the plaintiff special harm. *See Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011); *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 76 (S.D.N.Y. 2012); *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 (S.D.N.Y. 1991).

Bleeping does not dispute that the allegedly defamatory statements were published to a third party or "of and concerning" ESG. But, it argues, the SAC does not adequately plead the other elements of the defamation claims. The Court addresses these elements in turn.

> a.      *Falsity*

Bleeping argues that none of the statements at issue are actionable because each either (1) asserts true fact(s), or (2) is a protected statement of opinion. That is not correct.

"It is axiomatic that truth is an absolute, unqualified defense to a civil defamation action . . . and that substantial truth is all that is required." *Nyitray v. Johnson*, No. 96 Civ. 6150 (MBM), 1998 WL 67651, at *10 (S.D.N.Y. Feb. 19, 1998) (quoting *Smith v. United Church Ministry, Inc.*, 623 N.Y.S.2d 46, 46 (4th Dep't 1995)) (internal quotation marks omitted), *aff'd*, 166 F.3d 1201 (2d Cir. 1998). And, "New York law absolutely protects statements of pure opinion, such that they can never be defamatory." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (internal quotation marks and citation omitted). "Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only statements alleging facts can properly be the subject of a defamation action.'"

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152–53 (1993) (quoting *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139 (1992)).

To qualify as a protected opinion, a "statement must be accompanied by a recitation of the accurate facts on which it is based.  When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503 (S.D.N.Y. 2012) (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986)) (citation omitted).  Further, if the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity, the opinion may be an actionable "defamatory opinion[]." *Silsdorf v. Levine*, 59 N.Y.2d 8, 15–16 (1983) (reinstating defamation claim based on letter accusing former mayor of corruption because facts stated to demonstrate such corruption were allegedly false); *see also Como v. Riley*, 731 N.Y.S.2d 731, 731 (1st Dep't 2001).  "What differentiates an actionable mixed opinion from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown to [the] audience, which support [the speaker's] opinion and are detrimental to the person being discussed." *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014) (internal quotation marks and citation omitted).

Whether a challenged statement is fact or opinion is a question of law to be decided by the Court.  *See Steinhilber*, 68 N.Y.2d at 290.  The core inquiry is "whether a reasonable listener . . . could have concluded that [the defendant] was conveying facts about the plaintiff." *Von Gutfeld*, 80 N.Y.2d at 139; *accord Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 148 (2d Cir. 2000) ("[T]he dispositive inquiry . . . [is] whether the challenged statement can reasonably be construed to be stating or implying facts about the defamation plaintiff." (citations omitted)); *Davis*, 24 N.Y.3d at 269–70.  In making this determination, courts consider:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Davis*, 24 N.Y.3d at 270 (internal quotation marks, citations, and alterations omitted).  The third factor "is often the key consideration in categorizing a statement as fact or opinion."  *Id.* at 272 (internal quotation marks and citations omitted).  As a result, the New York Court of Appeals has "adopted a holistic approach to this inquiry":

> Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.

*Id.* at 270 (internal quotation marks and citations omitted); *see also Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) ("[A]n analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions . . . .  [S]tatements must be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts."  (citations omitted) (emphasis in original)).

Applying these principles and utilizing this holistic approach, the Court holds that the SAC adequately pleads that Bleeping, through Quietman7, made false, defamatory statements of fact about ESG and SpyHunter.  The allegedly defamatory statements cited in the SAC include Quietman7's statements that:

- "SpyHunter by [ESG] is a program that was previously listed as a rogue product on the Rogue/Suspect Anti-Spyware Products List because of the company's history of employing aggressive and deceptive advertising.  It has since been delisted but some users have reported they still engage in deceptive

advertising."  SAC, Ex. 6, at 3.[15]

- "SpyHunter is not classified as malware or rogue security software and other antivirus and antimalware vendors do not target it for removal.  Those security vendors which have tried in the past received threats of legal action for attempting to do so or agreed to legal settlements as a result of litigation brought forth by [ESG]."  *Id.*, Ex. 6, at 4.

- "In my opinion SpyHunter is a dubious program with a high rate of false positives."  *Id.*, Ex. 6, at 4.

- "SpyHunter by [ESG] is a dubious program and detection results should be analyzed carefully before you remove anything.  When searching for malware removal assistance (and removal guides) on the Internet, it is not unusual to find numerous hits from untrustworthy and scam sites which mis-classify detections or provide misleading information.  This is deliberately done more as a scam to entice folks into buying an advertised fix or using a questionable removal tool.  SpyHunter . . . , a dubious and ineffective program with a history of employing aggressive and deceptive advertising is one of the most common 'so-called' removal tools pushed by these sites."  *Id.*, Ex. 10, at 13–14.

The SAC alleges that these statements were "false and misleading when made."  *Id.* ¶ 81.

In assessing the parties' arguments as to whether these statements are reasonably susceptible to defamatory connotation, the Court finds that the Second Circuit's decision in *Flamm*, 201 F.3d 144, and the New York Court of Appeals' decision in *Gross*, 82 N.Y.2d 146, offer valuable guidance.

In *Flamm*, Flamm sued non-profit organizations for libel, alleging that they had made defamatory statements about him in their attorney referral directory.  201 F.3d at 146–47. Flamm took issue with defendants' statements that at least one client had described him as an "ambulance chaser" who was interested only in "slam dunk cases."  *Id.* at 147.  The district court

---

[15] Even if the Court were to conclude that the 2014 Post was not republished within the limitations period, *see supra* pp. 16–18, it would still be proper to consider the statements contained therein to give context to Quietman7's timely posts, which hyperlinked to the 2014 Post.

granted the motion to dismiss, holding that such statements could not reasonably be construed as statements of objective facts. *Id.* The Second Circuit reversed. Considering the "fact-laden context" in which the statements were made—a "straightforward directory" which was, "in all other respects, purely factual," *id.* at 152, 154—it held that the statements "reasonably implie[d] that [Flamm] ha[d] engaged in unethical solicitation," a fact capable of being proven true or false, *id.* at 151.

In *Gross*, the *New York Times* had published a series of investigative reports alleging that Gross, New York's chief medical examiner, had altered autopsy reports in cases in which people had died in police custody. 82 N.Y.2d at 150. The articles included statements from sources within the medical examiner's office that Gross had "ben[t] over backwards to help the police" and was "looking for a way out for the police." *Id.* (internal quotation marks omitted). The "over-all thrust of the series was that [Gross] had issued false or misleading reports . . . to protect the police and that his conduct ranged from 'highly suspicious' to 'possibly illegal.'" *Id.* (quoting articles). The trial court dismissed the complaint, and the First Department affirmed, holding that the average reader would recognize the allegations as expressions of opinion. *Id.* at 151. The Court of Appeals reversed. It held that, viewed in context, the allegation that Gross had engaged in "corrupt" conduct could reasonably be understood as a factual assertion. *Id.* at 154–57. It emphasized that the circumstances surrounding the investigative reports, including their placement in the news section and their apparent basis in "thorough investigation" and "deliberation," would have "encourag[ed] the reasonable reader to be less skeptical and more willing to conclude that [they] stat[ed] or impl[ied] facts." *Id.* at 156 (quoting *Von Gutfeld*, 80 N.Y.2d at 142).

The analyses in *Flamm* and *Gross* point to the same result here.  Viewed holistically, the "overall thrust" of Quietman7's thematically similar and mutually reinforcing statements is that ESG is engaged in a deliberate and fraudulent scam in which it is peddling a product which is the precise opposite of what it purports to be:  The challenged statements "reasonably imply" that ESG has intentionally designed SpyHunter, in its "free scanner" mode, to generate false positives so as to induce customers to buy a license for the full version to eliminate ostensible malware.  In other words, rather than being a means to enable a user to detect and remove unwanted spyware, SpyHunter is itself a rogue product designed to loot customers.  Such allegations—like the claims that Flamm was an "ambulance chaser" who only took "slam dunk cases," and that Gross engaged in "corrupt" conduct and "ben[t] over backwards to help the police"—could reasonably be understood as assertions of objectively verifiable facts.

To be sure, viewed in isolation, words used in Quietman7's posts like "scam," "rogue,"[16] "dubious," and "ineffective" would likely be too imprecise to be capable of being proven true or

---

[16] Bleeping emphasizes that Quietman7 did not state that SpyHunter is a rogue product, but rather that: (1) it "was *previously* listed as a rogue product on the Rogue/Suspect Anti-Spyware Products List"; (2) it "is not [currently] classified as malware or rogue security software"; and (3) "other antivirus and antimalware vendors do not target it for removal."  Def. Br. 13–14.  These statements, Bleeping argues, are non-defamatory and "undeniably true."  *Id.*  But the context of Quietman7's use of the word "rogue" makes his implication clear that the underlying practices that gave rise to that earlier classification persist.  For instance, Quietman7's statement that SpyHunter was previously listed as a rogue product is immediately followed by an assertion that "some users have reported [Engima] *still engage[s]* in deceptive advertising."  SAC, Ex. 6, at 3 (emphasis added).  And his statement that SpyHunter is not currently targeted for removal is followed by an allegation that "security vendors which have tried [to target it] in the past have received threats of legal action for attempting to do so or agreed to legal settlements as a result of litigation brought forth by Enigma Software."  *Id.*, Ex. 6, at 4.  Viewed in context, the challenged statements convey that, although SpyHunter has been "delisted," it remains a rogue product, and, but for ESG's wrongful threats and litigation tactics, would still be so classified.  *See Church of Scientology Int'l*, 778 F. Supp. at 666 (a court considering whether statements are "reasonably susceptible of a defamatory connotation" "must consider the publication as a whole and not pick out and isolate particular phrases"; the "accused words" should be read "against the background of their issuance with respect to the circumstances of their publication and the scope and

false. *See McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false."). But, in the context supplied by Quietman7, these words did not appear in isolation. His surrounding commentary made more concrete and reasonably precise the conduct of which he was accusing ESG: He denounced ESG for operating a business model whereby it "mis-classif[ies] detections" and generates "false positives," *i.e.*, bogus reports of finding spyware on customer computers, "to entice folks into buying" its "questionable removal tool." SAC, Ex. 10, at 13–14; *id.*, Ex. 6, at 4. He characterized that practice as a "deliberate[] . . . scam," and located ESG within a widespread and well-defined universe of con artists, identifying SpyHunter as one of the "most common" products peddled by the many "untrustworthy and scam sites" in the anti-malware software market. *Id.*, Ex. 10, at 13–14. These "scam sites," Quietman7 stated, hawk "pay-to-clean program[s, like SpyHunter], rather than [ ] free-to-clean program[s], because the site owner will make a commission on the sale of the program." *Id.*, Ex. 6, at 3–4. SpyHunter, he stated, is "one of the most common '*so-called*' removal tools pushed by these sites," and "should [therefore] be viewed with suspicion." *Id.*, Ex. 10, at 14 (emphasis added).

In this context, the words "rogue" and "dubious" accuse ESG of a defined course of conduct, and this claim, through discovery, can be proven or disproven.[17] *Id.*, Ex. 6, at 3–4; *see*

---

apparent object of the writer") (quoting *Lasky v. Am. Broad. Cos.*, 606 F. Supp. 934, 938 (S.D.N.Y. 1985)); *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963) (discrete "utterances [in article] are not so closely parsed by their readers or by the courts and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent").

[17] At argument, ESG's counsel interpreted Quietman7's claim that "we are rogue" as conveying "that we hold ourselves out . . . as a pretense of being an anti-malware trustworthy software that people should subscribe to when, in fact, we're not. We're coming up with false positives or . . . ways to deceive the consumer into thinking we're the product they should buy." *See* Tr. 50–51. Bleeping's counsel countered that Quietman7's statements could be construed, more benignly, to mean only that SpyHunter has a high error rate—not that it deliberately generates false results so

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1506 (D.S.C. 1989) (holding that terms "scam," "rip-off," and "bait and switch," considered in context, "ha[d] ascertainable meaning and c[ould] be identified as either true or false," because they "relay[ed] to the average viewer that the defendants ha[d] access to knowledge confirming that the plaintiffs ha[d] engaged in some course of wrong doing").

Other features of the Forums page, at least as described in the pleadings, lend heft to Quietman7's critical assessments as anchored in fact. Bleeping holds out the Forums page as tightly regulated by its member groups.[18] SAC ¶ 45. And it assures users that its "expert" staff members "can be trusted to give correct and understandable answers to [Bleeping's] member's

_____

as to induce sales. *See* Tr. 13 ("[P]erhaps reasonable minds can disagree about how you read it."). But even if Quietman7's statements could be so construed, a motion to dismiss must be denied where, as here, "the communication at issue, taking the words in their ordinary meaning and in context, is also susceptible to a defamatory connotation." *Davis*, 24 N.Y.3d at 272 (internal quotation marks and citations omitted).

Bleeping separately argues that the phrase "high rate of false positives" used by Quietman7 is too imprecise to be verifiable. *See* Tr. 9. The Court rejects that argument, as this allegation is no less exact than the allegations held potentially defamatory in *Flamm* and *Gross*. The claim of a "high rate of positives" could be tested, for example, by comparing SpyHunter's rate with those of competing products. That an accusation is "somewhat . . . vague and difficult to prove" does not mean that it is not objectively verifiable. *See Church of Scientology Int'l*, 778 F. Supp. at 667 (statement that plaintiffs were pursuing "hostile critique" of Prozac held factual because "the public nature of [plaintiffs'] activities and the public profile of the Prozac controversy indicate[d] that this [was] also a factual dispute with a determinable answer").

[18] This case is thus distinct from those, cited by Bleeping, holding statements in an online forum to be non-actionable opinion. *See* Def. Br. 15 (citing *Sandals Resorts Int'l v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (1st Dep't 2011) (calling "bulletin boards and chat rooms" a "repository of a wide range of casual, emotive, and imprecise speech"); *Brahms v. Carver*, 33 F. Supp. 3d 192, 195 (E.D.N.Y. 2014) (noting that statement was made in online forum "where people typically solicit and express opinions" and where the parties were then engaged in a "heated argument— replete with name-calling"); *Versaci v. Richie*, 815 N.Y.S.2d 350, 351–52 (N.Y. App. Div. 2006) ("rambling commentary" at issue was made "on an Internet public message board, which, as [alleged], is a forum where people air concerns about any matter")).

[sic] questions."  *Id.* ¶¶ 3, 32, 51.  This promise was, allegedly, reiterated by Quietman7 himself, whose posts "prominently identif[y]" him as a Global Moderator and "BC Staff."  *Id.* ¶ 71; *see id.*, Ex. 10, at 10 (6/1/15 post in "Rogue partition driving me insane!!!" forum topic:  "Folks come to Bleeping Computer for advice, recommendations and other assistance.  We provide that based on our experience and expertise so they can make an informed decision."); *compare Davis*, 24 N.Y.3d at 273 ("context further suggest[ed] to the reader that [defendant] spoke with authority, and that his statements were based on facts" where defendant "was a well respected, exalted member of the University . . . [and] well placed to have information about the [allegations he made]"), *with Egiazaryan*, 880 F. Supp. 2d at 509 (fact that author "[was] not a news writer for the periodical and [did] not purport to have undertaken a 'thorough investigation' or to have 'deliberat[ed] over the statements' supported conclusion that statements were non-actionable opinion) (quoting *Gross*, 82 N.Y.2d at 156).  The manner of Quietman7's written presentation—one using footnotes and citations—conveyed further that his advice was based on an "investigation" of verifiable facts.  *Gross*, 82 N.Y.2d at 156.

To be sure, Quietman7's Forums-page posts sporadically used qualifying statements, such as "[m]y personal recommendation" and "[i]n my opinion."  SAC, Ex. 7, at 2; *id.*, Ex. 6, at 4.  But these caveats do not "transform his [posts] into nonactionable pure opinion, because in context, a reasonable reader could view his statements as supported by undisclosed facts despite these denials."  *Davis*, 24 N.Y.3d at 273 (citation omitted); *see Flamm*, 201 F.3d at 152 ("The mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement." (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990)).  For the reasons reviewed above, notwithstanding these qualifier phrases, "[t]he impression created by [Quitman7's] words in the mind of a reasonable person could be that they

were purporting to state the truth of the matter, not merely [his] opinion." *Church of Scientology Int'l*, 778 F. Supp. at 668.

In a final argument, Bleeping urges that, to the extent Quietman7's statements purport to report and recap consumer complaints or are otherwise truthful, they are "accurate and thus incapable of supporting a defamation claim." Def. Br. 13; *see id.* at 14 (citing, as example of truthful statement, Quietman7's statement that "SpyHunter is not classified as malware or rogue security software and other antivirus and antimalware vendors do not target it for removal"). But even if some discrete statements by Quietman7 were accurate, that would not shelter his statements as a whole from a defamation claim, because the SAC adequately alleges that Quietman7's overall derogatory depiction of ESG and SpyHunter was substantially false. *See* SAC ¶¶ 81–85.[19]  And as to the cited consumer complaints specifically, ESG alleges that these largely contained *false* claims about it and SpyHunter, and were "generated by a group of individuals . . . engaged in an anticompetitive campaign against ESG." *Id.* ¶ 83.  A speaker who repeats another's defamatory statement is not made immune from liability for defamation merely because another person previously made the same demeaning claim. *See Flamm*, 201 F.3d at 152 ("[T]he fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character." (quoting *Brian v. Richardson*, 87 N.Y.2d 46, 54 (1995)); *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60–61 (2d Cir. 1980) (noting "widely recognized" "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally,

---

[19] As the Court of Appeals stated in *Gross*, it is unnecessary that "every word and assertion in [a] disputed [publication] is false or defamatory."  82 N.Y.2d at 154.  As long as a publication contains at least some "assertions of objective fact that, if proven false, could form the predication for a maintainable libel action," dismissal of a complaint on the pleadings is improper.  *Id.*

even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement") (internal quotation marks and citation omitted); *Condit v. Dunne*, 317 F. Supp. 2d 344, 364 (S.D.N.Y. 2004) (although statements were "literally true because defendant clarifie[d] that he [was] merely retelling stories told to him[,]" defendant was not "immune from a slander suit" because "the stories themselves [were] false and defamatory").  And while statements are generally protected where the speaker indicates that they represent only "his own interpretation of [disclosed] facts[,] . . . leaving the reader free to draw his own conclusions," *Condit*, 317 F. Supp. 2d at 364 (internal quotation marks and citation omitted), this principle does not apply where the disclosed facts are themselves false.  *See Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) ("[W]here the plaintiff alleges that both the opinions and the facts are false, a motion to dismiss should not be granted, and the plaintiff may proceed against both the statements of fact and opinion.").

The Court, therefore, holds that the SAC adequately pleads the first element of ESG's defamation claims—false, defamatory statements about ESG.

> b.    *Fault*

Bleeping next challenges the defamation claims by arguing that ESG is a limited-purpose public figure, and that the SAC does not plead that Bleeping acted with the heightened level of fault corresponding to that status.  This argument also fails.

The level of fault that a defamation plaintiff must plead depends on the plaintiff's status.  There are three recognized classes of plaintiffs: (1) "general public figures," *i.e.*, public officials or persons whose conduct is generally a matter of interest to the public; (2) "limited public figures," *i.e.*, persons whose conduct is of interest to certain portions of the public as to a limited range of issues; and (3) "private figures."  *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323,

351 (1974); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154–55 (1967); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).  Public-figure plaintiffs must plead "'actual malice'—that is, [ ] knowledge that [the statement at issue] was false or [ ] reckless disregard of whether it was false or not."  *N.Y. Times Co.*, 376 U.S. at 280.  By contrast, under New York law, private-figure plaintiffs must plead only negligence or, "where the content . . . is arguably within the sphere of legitimate public concern," that "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Ratajack v. Brewster Fire Dep't, Inc.*, No. 14 Civ. 7 (KMK), 2016 WL 1274581, at *27 (S.D.N.Y. Mar. 31, 2016) (quoting *Chapadeau v. Utica Observer– Dispatch, Inc.*, 38 N.Y.2d 196, 199 (1975)).  Whether a plaintiff is a public figure is a question of law for the Court to decide.  *See Church of Scientology Int'l*, 778 F. Supp. at 666 n.3.

Here, Bleeping argues that ESG is a limited-purpose public figure and, therefore, to state a claim, must allege that Bleeping acted with actual malice.  Def. Br. 11–13; Def. Reply Br. 8–9.  The SAC's key allegations that would bear on actual malice are that Bleeping: (1) never properly or fully tested SpyHunter, despite knowing that such testing is the only reasonable way to gauge its efficacy; (2) relied on discredited and outdated sources assailing SpyHunter, despite knowing or recklessly disregarding that ESG had publicly disproved them; (3) has a financial incentive to disparage ESG because it profits from sales of competing products; and (4) refused to correct or retract its defamatory statements when ESG confronted it.  SAC ¶¶ 7, 12–13, 82–85, 96.  These allegations, Bleeping argues, do not plausibly support the conclusion that Bleeping acted with actual malice.  Def. Reply Br. 8–9.

This argument fails at the threshold:  Although the facts adduced in discovery may yet show that ESG is a limited-purpose public figure, the Court cannot, on the pleadings, conclude

that ESG must be so. *See Kapetanovic v. Cannell*, No. 97 Civ. 2224, 1998 WL 474141, at *2

(N.D. Ill. Aug. 6, 1998) (denying motion to dismiss based on failure to plead actual malice

because it was not clear from complaint's face that plaintiff was a public figure). And ESG's

pleadings comfortably satisfy the lesser fault showing required for a private figure.

The Second Circuit has adopted a four-part test to determine whether a plaintiff is a

limited-purpose public figure. To qualify, a plaintiff must have: "(1) successfully invited public

attention to [its] views in an effort to influence others prior to the incident that is the subject of

litigation; (2) voluntarily injected [itself] into a public controversy related to the subject of the

litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained

regular and continuing access to the media." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37

(2d Cir. 1984); *accord Biro*, 963 F. Supp. 2d at 270. Bleeping argues that the SAC satisfies

these elements by alleging that ESG (1) has "millions of customers" and "enjoys worldwide sales

of Spyhunter"; (2) "has received top industry certifications" from "highly regarded accreditation

program[s]"; and (3) has a "reputation in the software community for being highly litigious in

response to claims about its products." Def. Br. 12 (citing SAC ¶¶ 21, 25, 29–30).[20]   However,

---

[20] As to the final point, the SAC contains no allegations bearing on ESG's reputation for
litigiousness. Instead, on this point, Bleeping relies on a document it attached as an exhibit to its
initial motion to dismiss. *See* Dkt. 17, Ex. 4. But this document—a screenshot of a third-party's
website—is neither attached to nor incorporated by reference in the SAC. Accordingly, it is not
cognizable here. *See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106,
123–24 (S.D.N.Y. 2010) (declining to consider extrinsic documents that were neither referenced
in nor attached to the complaint); *Adams v. Crystal City Marriott Hotel*, No. 02 Civ. 10258
(PKL), 2004 WL 744489, at *3 (S.D.N.Y. Apr. 6, 2004) (declining to consider "Certification"
attached to plaintiff's opposition brief because it was neither attached to nor incorporated by
reference in complaint); *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273,
276 (S.D.N.Y. 2002) (extraneous document not incorporated by complaint's brief reference to
it). In any event, as discussed below, evidence of ESG's reputation for litigiousness has no
bearing on its status as a limited-purpose public figure here.

the cognizable allegations, viewed together, do not "justify application of the demanding burden of *New York Times*." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 168 (1979).

As an initial matter, Bleeping has not clearly identified a "public controversy related to the subject of [this] litigation." *Biro*, 963 F. Supp. 2d at 270 (quoting *Lerman*, 745 F.2d at 136–37).  It asserts that "[t]he public controversy at issue here is Plaintiff's deceptive business practices, the danger its software poses, and Plaintiff's harassment of those who criticize it." Def. Reply Br. 8.  But this "controversy" melds three disparate issues.  And it is not obvious, from the cognizable material, that any of these matters, significant as they may be in discrete quarters, qualifies as a "topic upon which sizeable segments of society have different, strongly held views." *Lerman*, 745 F.2d at 138.

Moreover, even assuming an identifiable public controversy, the Court cannot, based on the pleadings, conclude confidently that ESG "voluntarily injected" itself into that controversy. Bleeping argues that ESG's sales and recognition alone satisfy this requirement.  Def. Br. 12. But New York courts have held that "the mere fact that a business enterprise is successful is an insufficient reason to deem it a public figure." *Behr v. Weber*, No. 16047/89, 1990 WL 270993, at *2 (Sup. Ct. N.Y. Cty. Jan. 5, 1990), *aff'd*, 568 N.Y.S.2d 948 (1st Dep't 1991) (citation omitted); *see, e.g.*, *Lee v. City of Rochester*, 663 N.Y.S.2d 738, 742–45 (Sup. Ct. Monroe Cty. 1997), *aff'd*, 677 N.Y.S.2d 848 (4th Dep't 1998) (evidence of plaintiff's "high profile effort to promote his business" did not make him a public figure where there was "no public controversy attend[ing] plaintiff's self-promotion efforts"); *see also Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 536 (E.D. Pa. 1999) (despite being "one of the largest and most influential corporations in the world," Hewlett-Packard was not a limited-purpose public figure

because it did not voluntarily thrust itself into a public controversy).[21]  Rather, the plaintiff must "tak[e] an affirmative step to attract public attention *with respect to the subject of the allegedly defamatory commentary*."  *Lee*, 663 N.Y.S.2d at 744 (collecting cases) (internal quotation marks and citations omitted) (emphasis added).

The SAC does not allege any facts suggesting that ESG has taken a public position on the integrity of its business practices or the quality of its products.  Nor would the extrinsic evidence that Bleeping has offered as to ESG's purported litigiousness cure this problem.  Even if ESG has brought multiple lawsuits challenging allegedly defamatory claims about its products, such conduct does not mark ESG's "voluntary injection" into a public controversy on this matter.  To the contrary, "[i]t [may] be more accurate to say that [ESG] was dragged unwillingly into the controversy."  *Wolston*, 443 U.S. at 166; *see Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 252 (S.D.N.Y. 2001) (defendants' public denials of allegedly defamatory claims "do not constitute their 'injecting' themselves into a public controversy"); *Lee*, 663 N.Y.S.2d at 745 ("Litigation . . . even if accompanied by press coverage . . . does not alone render the dispute a 'public controversy.'" (additional internal quotation marks and citation omitted)); *Time, Inc. v.*

---

[21] The two cases on which Bleeping relies in arguing the contrary are inapposite.  *See* Def. Reply Br. 8–9.  In *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977), the court found that the defendant—a large public company with more than $1 billion in assets—had attained sufficient prominence to qualify as "a public figure in the general sense, [as well as] in the specific context" of the claims at issue.  Here, by contrast, the SAC affords no basis on which to infer that "[ESG's] role in society is such that it is a figure generally in the public eye."  *Id.*  In *Steaks Unlimited v. Deaner*, 623 F.2d 264, 273–74 (3d Cir. 1980), the court held that the plaintiff, through its intensive "advertising blitz," had "created a controversy for the purpose of influencing the consuming public," and thus "voluntarily injected itself into a matter of public interest."  Here, by contrast, the SAC pleads no facts regarding ESG's marketing campaign for SpyHunter, and there is no basis to infer that it has similarly "invited public attention, comment, and criticism."  *Id.* at 274; *see Computer Aid, Inc.*, 56 F. Supp. 2d at 537 (distinguishing *Steaks Unlimited* where there was no evidence that Hewlett-Packard had "gone on an extensive media or advertising campaign to . . . to entice investors and customers, respectively, to purchase [its] securities or products").

*Firestone*, 424 U.S. 448, 454 (1976) (where respondent was forced to go to court in order to obtain a divorce, her "[r]esort to the judicial process . . . [was] no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court") (internal quotation marks and citation omitted).

Absent a fuller factual record, the Court therefore cannot conclude that ESG is a limited-purpose public figure with regard to the subject of the statements at issue.  It is thus premature to hold ESG to a heightened standard of actual malice.  And the SAC—by alleging, *inter alia*, that Bleeping knowingly or recklessly relied on discredited and outdated sources, *see* SAC ¶¶ 83–85—adequately pleads that Bleeping "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Chapadeau*, 38 N.Y.2d at 199.  (Bleeping has not disputed this point.)  The SAC therefore has adequately pled the third element of its defamation claims.

### c.    Harm

Finally, Bleeping argues, for the first time in a footnote in its reply, that ESG has failed to plead harm—*i.e.*, either special damages or libel *per se*.  Def. Reply Br. 9 n.10.  This argument is baseless.

Under New York law, a written statement constitutes libel *per se* where it "tend[s] to injure another in his or her trade, business, or profession."  *Zherka v. Amicone*, 634 F.3d 642, 645 n.6 (2d Cir. 2011); *accord Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 0442 (DLC), 2016 WL 815205, at *9 (S.D.N.Y. Feb. 29, 2016).  "Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties."  *Van-Go Transp. Co., Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997).

Here, the SAC alleges that Bleeping made statements to the effect that ESG engages in fraudulent business practices, peddling an ineffective product which is the exact opposite of what it purports to be. *See, e.g.*, SAC ¶ 80; *id.*, Ex. 6, at 4 ("SpyHunter is a dubious program with a high rate of false positives."); *id.*, Ex. 10, at 14 ("[ESG has] a history of employing aggressive and deceptive advertising."). Such statements, which "go directly to the nature, characteristics and qualities of ESG's business and its SpyHunter product," *id.* ¶ 81, "impugn[] the basic integrity or creditworthiness of [ESG's] business," *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (quoting *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981)). Injury, therefore, is "conclusively presumed." *Id.*[22]

\* \* \*

The Court, therefore, holds that ESG has adequately pled each element of its defamation claims. Accordingly, Bleeping's motion to dismiss these claims is denied.

### 2.   Has ESG Stated a Claim for Trade Libel/Commercial Disparagement?

The SAC brings a claim for trade libel/commercial disparagement, alleging that Bleeping published false statements that "impugn the integrity of ESG and the quality and efficacy of SpyHunter." SAC ¶ 110; *see id.* ¶¶ 108–15.

Under New York law, "[t]rade libel or product disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property." *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989). Like defamation, trade libel is based on an injurious falsehood published to a

---

[22] Given this holding, the Court need not determine whether ESG has adequately pled special damages. *See Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) ("[S]tatements [found] to be libelous *per se* [ ] do not require pleading and proof of special damages.").

third party.  *Ruder*, 52 N.Y.2d at 670.  However, whereas defamation (in the commercial

context) entails a statement that "impugns the basic integrity or creditworthiness of a business,"

trade libel is based on statements "confined to denigrating the quality of a business' *services* [*or*

*products*]."  *Ehrenkranz v. 58 MHR, LLC*, 18 N.Y.S.3d 578 (Sup. Ct. Suffolk Cty. 2015) (table

decision) (emphasis added).  To state a claim for trade libel, a plaintiff must adequately plead

"(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied),

and (4) [ ] special damages."  *Angio-Med. Corp.*, 720 F. Supp. at 274 (citation omitted); *accord*

*Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628 (RWS), 2002 WL

31398933, at *5 (S.D.N.Y. Oct. 24, 2002).

Bleeping argues that, insofar as the SAC relies on the same statements and alleged harm

that form the basis for ESG's defamation claims, ESG's trade libel claim must be dismissed as

duplicative of those claims.  Def. Br. 19–20; Def. Reply Br. 5.  On this, it is correct.  *See*

*Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order)

(holding "district court correctly dismissed [plaintiff's] other tort claims as duplicative of his

defamation claim" where "the factual allegations underlying [those] . . . claims [were] virtually

identical to the facts underlying his defamation claim" and "the harms that [plaintiff] contend[ed]

he suffered as a result of the[] other torts . . . all flow[ed] from the effect on his reputation caused

by defendants' allegedly defamatory statements") (internal quotation marks and citations

omitted); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 726 (S.D.N.Y.

2014) (dismissing tortious interference claim as duplicative of defamation claim where all

alleged injuries arose out of the allegedly defamatory statements); *O'Brien v. Alexander*, 898 F.

Supp. 162, 172 (S.D.N.Y. 1995) (injurious falsehood claim was duplicative of defamation claim

38

where it "relie[d] on the same statements [and alleged damages] that form[ed] the basis of the defamation claim").[23]

ESG argues that its trade libel claim is not duplicative because it is "directed to different statements on different topics within a given post, rather than the 'same statements.'" Pl. Br. 5 n.2. Both sets of claims should be permitted to go forward, ESG argues, because the former "targets statements that go to the quality and efficacy of ESG's services and products," whereas the latter "goes to statements that impugn the character and business ethics of ESG" itself. *Id.*

This argument fails to avert dismissal because, to the extent the SAC's trade libel claim is *not* duplicative of its defamation *per se* claim, it suffers from another fatal deficiency: The SAC does not adequately plead special damages. *See Ruder*, 52 N.Y.2d at 671; *Drug Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 440 (1960).

"Language which merely disparages a product is not actionable unless special damages are pleaded and it appears that such damage is a natural and immediate consequence of the disparaging statements." *Angio-Med. Corp.*, 720 F. Supp. at 274 (citation omitted); *accord Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 813 (Sup. Ct. N.Y. Cty. 2005) ("Trade libel requires proof of special damages; while libel *per se*, even if based on disparagement in business, requires no such proof of special damages."). Special damages are "limited to losses having pecuniary or economic value, and must be fully and accurately stated, with sufficient particularity to identify actual losses." *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y.

---

[23] *See also Angio-Med. Corp.*, 720 F. Supp. at 274 ("[Where] the disparaging statements impeach the business methods or integrity of the plaintiff himself, . . . [t]he action . . . qualif[ies] as [defamation] *per se* instead of trade libel."); *Van-Go Transp.*, 971 F. Supp. at 98 (claims sounded in defamation *per se*, not trade libel, where "gist of . . . complaint [was] that the statements falsely impugned the basic trustworthiness and integrity of [plaintiffs'] business") (internal quotation marks and citation omitted).

1992) (internal quotation marks and citations omitted).  "The requirement of pleading and ultimately proving special damages goes to the cause of an action itself and not merely to the recovery. . . .  Courts considering product disparagement claims have therefore applied this requirement strictly, granting motions to dismiss . . . for failure to allege special damages with the requisite specificity."  *Computech Int'l*, 2002 WL 31398933, at *6 (internal quotation marks and citation omitted).  "If the special damage was a loss of customers . . . the persons who ceased to be customers, or who refused to purchase, must be named . . . .  [I]f they are not named, no cause of action is stated."  *Drug Research Corp*., 7 N.Y.2d at 441 (internal quotation marks and citations omitted).

Here, as to damages, the SAC alleges only that as a result of Bleeping's unlawful acts in general, "ESG has and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000."  SAC ¶ 115.  Given the pleading requirement of special damages, that allegation is far "too generalized to survive dismissal."  *Kirby*, 784 F. Supp. at 1116, 1118 (where plaintiff claimed defendant made false and disparaging statements about painting that prevented its sale, "vague allegation[]" that plaintiff sustained $250,000 in damages, without specifying losses underlying that figure or identifying any person who did not bid on the painting because of the alleged disparagement, was "clearly inadequate" to plead special damages); *see also, e.g.*, *Drug Research Corp*., 7 N.Y.2d at 441 (plaintiff failed to plead special damages where it alleged damages of $5 million because "[s]uch round figures, with no attempt at itemization, must be deemed to be a representation of general damages").

The SAC, therefore, has not pled a *prima facie* claim for trade libel.  This claim must be dismissed.

40

### 3.      Has ESG Stated a Lanham Act Claim for False Advertising?

Finally, the SAC brings a claim for false advertising under Section 43(a) of the Lanham Act.  It alleges that Bleeping made false and misleading statements about ESG and SpyHunter which were intended to deceive consumers as to the nature, quality, and efficacy of SpyHunter, in order to divert sales from ESG to Malewarebytes, from whom Bleeping receives commissions. *See* SAC ¶¶ 101–07.

Section 43(a) prohibits making "false or misleading description[s] . . . or . . . representation[s] of fact," in "commercial advertising or promotion," about the "nature, characteristics, [or] qualities . . . of [one's own] or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1).  To be actionable under the Lanham Act, statements must constitute "commercial advertising or promotion."  *Romeo & Juliette Laser Hair Removal*, 2016 WL 815205, at *7.  A false advertising claim under § 43(a) must also allege that: (1) "the statement in the challenged advertisement is false . . . or . . . likely to deceive or confuse consumers"; (2) the defendant "misrepresented an inherent quality or characteristic of the product"; (3) the defendant "placed the false or misleading statement in interstate commerce"; and (4) "the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products."  *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (internal quotation marks and citations omitted).

Bleeping moves to dismiss ESG's Lanham Act claim on the grounds that: (1) the statements challenged in the SAC are not "commercial advertising or promotion"; and (2) ESG has not adequately pled the other elements of a § 43(a) claim.  The Court first addresses whether

Quietman7's posts constitute "commercial advertising or promotion," and then considers the remaining elements.

a.    *Commercial Advertising or Promotion*

The "touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). In this Circuit, "to constitute 'commercial advertising or promotion' . . . a statement must be: (1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (collecting cases) (additional internal quotation marks and citations omitted); *accord Boule v. Hutton*, 328 F.3d 84, 90 (2003). Many district courts have also adopted a fourth requirement, articulated by Judge Sand in *Gordon & Breach*, 859 F. Supp. at 1536: that the statement be made "by a defendant who is in commercial competition with plaintiff." *See, e.g.*, *Multivideo Labs, Inc. v. Intel Corp.*, No. 99 Civ. 3908 (DLC), 2000 WL 12122, at *15 (S.D.N.Y. Jan. 7, 2000); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1019 (S.D.N.Y. 1994).

Bleeping argues that the SAC does not adequately plead "commercial advertising or promotion" because: (1) the statements it challenges are not commercial speech; (2) it does not allege sufficient dissemination to the relevant consumer market; and (3) it does not allege that Bleeping itself is ESG's competitor. Def. Br. 21–24; Def. Reply Br. 9–10. The Court considers these arguments in turn.

42

          *i.*       *Commercial Speech Made for the Purpose of Influencing Consumers*

Pure commercial speech "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted). But a "hybrid" communication, *i.e.*, one that combines commercial and non-commercial elements, may nonetheless be "commercial" where (1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation for the speech. *Id.* at 66–67 (pamphlets containing information about sexually transmitted disease were "properly characterized as commercial speech," notwithstanding their discussion of important social issues, because they were advertisements that referenced the publisher's products, and publisher had an economic motivation for disseminating them); *Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002); *see also Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1235–36 (S.D.N.Y. 1991) (speech "may properly be classified as 'commercial', notwithstanding its social aspects" where it was made "at least primarily[] for business purposes").

Applying these standards, the Court holds that Quietman7's posts are commercial speech. In nearly all of them, Quietman7, after lambasting ESG's SpyHunter, recommends that the reader "remove [that] program and *replace it with a trustworthy alternative*," such as Malwarebytes Anti-Malware and other Affiliate products. SAC, Ex. 7, at 2–3 (emphasis added); *id.*, Ex. 8, at 3; *see also id.*, Ex. 10, at 10, 13–14; *see also* Tr. 21 (acknowledgement by Bleeping's counsel that, in various posts, Quietman7 both disparages ESG's product *and* encourages the purchase of Malwarebytes' product "as an alternative"). By promoting Bleeping's Affiliate products as superior to SpyHunter, these posts unmistakably constitute advertisements for the Affiliate products. (Indeed, Quietman7 goes one step further, providing links through which users can purchase the products. *See* SAC ¶ 91; *id.*, Ex. 7, at 2–3; *id.*, Ex. 8,

at 3; *id.*, Ex. 10, at 13–14.)  And, by alleging that Bleeping earns a commission on directed sales

of those products, the SAC adequately pleads that Bleeping has an economic incentive to engage

in such promotion.[24]  *See Handsome Brook Farm, LLC v. Human Farm Animal Care, Inc.*, No.

115 Civ. 592 (JCC), 2016 WL 3348431, at *6 (E.D. Va. June 15, 2016) ("economic incentive"

prong satisfied where defendant promoted products sold by suppliers from whom it received

licensing fees based on percentage of products sold).

Therefore, Quietman7's posts are fairly pled to be "commercial speech" "made for the

purpose of influencing consumers to buy [products in which Bleeping has a financial stake]."

*Gmurzynska*, 355 F.3d at 210 (internal quotation marks and citation omitted); *see Romeo &*

*Juliette Laser Hair Removal*, 2016 WL 815205, at *7 (defendants' comments constituted

commercial speech because, "[b]y [ ] disparaging the plaintiff's business and simultaneously

promoting [defendants' business], the defendants acted in pursuit of their economic interests");

*Mobius*, 880 F. Supp. at 1020 (commercial speech test satisfied where defendant's letter "was an

explicit invitation to purchase [its] product over that of [plaintiff]"); *Handsome Brook Farm*,

2016 WL 3348431, at *7 ("The Court has little difficulty concluding that speech is commercial

when it comes from a speaker whose organizational goal is to direct demand toward certain

consumer goods, the speaker receives revenue based on the amount of those goods sold, that

revenue is the speaker's largest source of income, and the speech in question directly promotes

---

[24] *See* SAC ¶¶ 10–12 (because Bleeping receives commissions from Malwarebytes but not ESG, it has "a direct financial interest in driving traffic and sales to Malwarebytes and driving traffic and sales away from ESG"), 37 ("By providing Affiliate Links, Bleeping earns a commission if a consumer simply clicks on the link and then purchases the product that Bleeping is peddling."), 42–43 (noting that Bleeping "generates revenues through advertising and commissions from affiliates," such as Malwarebytes, Emsisoft, and SuperAntiSpyware), 44 ("Bleeping functions as a sales arm of Malwarebytes.").

those same goods while disparaging the goods of a competitor.").  The SAC has thus adequately

pled the first two elements of "commercial advertising or promotion."

ii.        <em>Dissemination to the Relevant Consumer Market</em>

To constitute commercial advertising or promotion, commercial speech "must be

disseminated sufficiently to the relevant purchasing public."  *Gmurzynska*, 355 F.3d at 210

(internal quotation marks and citation omitted).  "[T]he level of circulation required to constitute

advertising and promotion will undeniably vary from industry to industry and from case to case."

*Gordon & Breach*, 859 F. Supp. at 1535 (internal quotation marks and citation omitted); *see,*

*e.g.*, *Mobius*, 880 F. Supp. at 1020–21 (single letter addressed to potential purchaser of plaintiff's

software product was sufficient to satisfy "dissemination" requirement because relevant

purchasing market was small).

Here, the SAC alleges that Quietman7's posts were part of "an organized campaign by

Bleeping to penetrate the market for anti-malware products" by repeating or linking to negative

reviews of SpyHunter "any time a new forum topic mention[ed] or inquir[ed] about ESG."  SAC

¶ 106.[25]  The Second Circuit has "le[ft] open the possibility" that such a scheme might support

the "dissemination" requirement if the defendant's "policy of reactive disparagement

successfully reaches a substantial number of the competitor's potential consumers."  *Fendi*, 314

F.3d at 58.

---

[25] Notably, the SAC alleges that Bleeping goes beyond ridiculing ESG:  "To further influence its
users to purchase Malwarebytes' products and not ESG products, [it also] remove[s] links posted
by users that suggest using an ESG product."  SAC ¶ 92; *see also id.*, Ex. 11 at 4 (8/5/15 post by
Quietman7) (stating that, "per Bleeping Computer policy," Quietman7 had removed user's post
referencing SpyHunter; post then criticizes ESG and SpyHunter).

Here, the "relevant purchasing public" consists of potential consumers of anti-malware software.  Quietman7's posts were aimed at such consumers:  Bleeping advertises itself as a "premier destination" for computer users seeking information about computer technology and recommendations regarding malware removal.  *See* SAC ¶¶ 2, 4, 6, 59.[26]  And the cognizable materials support an inference that the posts reached a sizable swath of this constituency.  The statements challenged in the SAC were posted on a public Internet forum, where they could be viewed by the "[more than] 3.5 million unique visitors [that visit Bleeping's website each] month," copied, and re-disseminated.  Prager Decl., Ex. 1, at 1;[27] *see also* SAC ¶ 14 (alleging that Bleeping's statements about ESG have been, "with Bleeping's encouragement and express permission, . . . reposted numerous times on other anti-malware related forums and websites").  They are thus far from the "isolated disparaging statements" that have been held "not [to] have redress under the Lanham Act."  *Fendi*, 314 F.3d at 57 (evidence that defendant made 27 *oral* statements in marketplace of thousands of customers was insufficient to satisfy dissemination

---

[26]  Bleeping's counsel acknowledged at argument that the Bleeping Forums page is a site which "consumers of [anti-malware] products are apt to be on."  Tr. 21.

[27] These figures are drawn from a screenshot of the "Advertise on BleepingComputer.com" page of Bleeping's website, submitted as an attachment to ESG's counsel's declaration.  Prager Decl., Ex. 1.  "For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006); *accord Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (taking judicial notice of printouts of defendant's website because defendant did "not actually dispute the factual material reflected in [them]," but rather "simply . . . prefer[red] that the Court not consider [them]"); *Sarl Louis Feraud Int'l v. Viewfinder Inc*., 406 F. Supp. 2d 274, 277 (S.D.N.Y. 2005) ("[A]ll of the facts relevant to the resolution of the matter are contained either in the complaint, or in materials (such as the records of the French proceedings or the defendant's websites) that are either referred to in the complaint or of which the Court may take judicial notice."), *vacated and remanded on other grounds*, 489 F.3d 474 (2d Cir. 2007).  Bleeping has not disputed any of the factual material represented on its website.

requirement) (citing *Sports Unlimited., Inc. v. Lankford Enters., Inc*., 275 F.3d 996, 1004–05 (10th Cir. 2002) (dissemination of information to two customers, where plaintiff made up to 150 bids per year, was insufficient)).

The SAC therefore adequately pleads that the challenged statements were "disseminated sufficiently" to the relevant consumer market. *Gmurzynska*, 355 F.3d at 210 (quoting *Fendi*, 314 F.3d at 56). It thus satisfies the third element of "commercial advertising or promotion."

### iii.        Competitive Relationship with the Plaintiff

In *Gordon & Breach*, Judge Sand held that, to constitute "commercial advertising or promotion" under § 43(a), the allegedly false representation must be made by someone who is "in commercial competition with [the] plaintiff." 859 F. Supp. at 1536. The Second Circuit has "express[ed] no view on [the] soundness" of this requirement, *Fendi*, 314 F.3d at 58, or "whether [it] is necessary to find commercial advertising and promotion," *Boule*, 328 F.3d at 91. However, a number of courts have held that any door left open by the Second Circuit as to the "competitors" requirement was "firmly closed by the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014)." *Healthnow N.Y. Inc. v. Catholic Health Sys., Inc*., No. 14 Civ. 986S (WMS), 2015 WL 5673123, at *4 (W.D.N.Y. Sept. 25, 2015) (citation modified); *see also, e.g.*, *Handsome Brook Farm*, 2016 WL 3348431, at *6; *Tobinick v. Novella*, No. 14 Civ. 80781, 2015 WL 1191267, at *5 n.10 (S.D. Fla. 2015) ("After the Supreme Court's decision in *Lexmark*[,] . . . it does not appear that the second prong of the *Gordon & Breach* test, which requires that the defendant be in commercial competition with the plaintiff, remains good law.") (citation omitted); *Educ. Impact, Inc. v. Danielson*, No. 14 Civ. 937 (FLW), 2015 WL 381332, at *13 (D.N.J. Jan. 28, 2015).

In *Lexmark*, the Supreme Court held that, to have standing to sue under § 43(a), a plaintiff need not allege that the parties are direct competitors.  134 S. Ct. at 1393–95.  Rather, "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Id.* at 1395.  Although the Supreme Court "express[ed] no view" on whether the plaintiff there had adequately alleged "commercial advertising or promotion," *id.* at 1385 n.1, "[m]any post-*Lexmark* cases have seized on [that decision] . . . to conclude that such a relationship is [also] not necessary to show commercial advertising or promotion," *Handsome Brook Farm*, 2016 WL 3348431, at *6 ("[I]t would be a perplexing decision by the Supreme Court to conclude that indirect competitors had standing to bring a Lanham Act claim, but those same plaintiffs' claims would necessarily fail on the merits due to lack of direct competition.").  The reasoning of those decisions is persuasive, and there is, post-*Lexmark*, no contrary authority.  The Court accordingly holds that ESG need not plead that Bleeping was its competitor,[28] and therefore, that the SAC has adequately pled "commercial advertising or promotion" within the scope of the Lanham Act.

### b.    *False Advertising*

The SAC adequately pleads the other elements of ESG's § 43(a) claim: (1) a false or misleading statement that (2) misrepresents an inherent quality or characteristic of the product, (3) is placed in interstate commerce, and (4) injures the plaintiff by diverting sales or lessening the goodwill associated with its products.  *See Merck Eprova*, 760 F.3d at 255.

First, for the reasons reviewed in connection with the defamation claims, the SAC pleads that Bleeping made false statements about ESG and SpyHunter.  Its allegations, therefore,

---

[28] In any event, even if a competitive relationship were required, the SAC's allegations that Bleeping, by virtue of its Affiliate program, "functions as a sales arm of Malwarebytes," SAC ¶¶ 42–44, which is a "direct ESG competitor," *id.* ¶ 10, would satisfy this requirement.

necessarily satisfy the Lanham Act's more lenient requirement that the challenged statements be "false *or misleading*."  15 U.S.C. § 1125(a)(1) (emphasis added); *see Merck Eprova*, 760 F.3d at 255 ("Falsity may be established by proving that (1) the advertising is literally false as a factual matter, *or* (2) although the advertisement is literally true, it is likely to deceive or confuse customers." (internal quotation marks and citation omitted) (emphasis added)); *Time Warner Cable, Inc. v. DIRECTV, Inc*., 497 F.3d 144, 153 (2d Cir. 2007) ("[P]laintiffs alleging an implied falsehood [under the Lanham Act] are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality." (internal quotation marks and citation omitted)).

Second, Bleeping's statements about SpyHunter's ineffectiveness implicate inherent qualities and characteristics of that product.  Accordingly, they are likely to "influence the purchasing decisions of consumers," and are thus "material" for purposes of § 43(a).  *Mylan Pharm., Inc. v. Procter & Gamble Co*., 443 F. Supp. 2d 453, 462 (S.D.N.Y. 2006); *accord Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 423 (S.D.N.Y. 2013).

Third, "[t]here is no dispute that posting to internet fora placed the statements in interstate commerce."  *Romeo & Juliette Laser Hair Removal*, 2016 WL 815205, at *7.

Fourth, the SAC alleges that, "[a]s a direct and proximate result of [Bleeping's] unlawful acts, ESG has suffered . . . significant monetary and reputational injury, including direct diversion of sales and a lessening of goodwill associated with its products."  SAC ¶ 107; *see also id.* ¶ 99.  According to the SAC, Bleeping's members—many of whom "do not know the 'basic concepts' that underlie computer . . . issues"—"rely on Bleeping's representations and recommendations when purchasing . . . [anti-malware products]."  *Id.* ¶ 4.  Indeed, the SAC alleges, Bleeping itself acknowledges its ability to influence consumers.  *See id. ¶* 90

("Bleeping's instructions to its users are heeded—in fact, Bleeping openly touts its influence on the purchasing decisions of its users.  After disparaging ESG and SpyHunter4, Quietman7 trumpeted that '[s]ince we [Bleeping] do not recommend this program [SpyHunter], I doubt that any of our members use it.'").  And, the cognizable materials show that at least one consumer has heeded Bleeping's advice, to ESG's detriment.  *See id.*, Ex. 10, at 11 (user response to Quietman7's 6/1/15 post in the "Rogue partition driving me insane!!!" forum topic:  "I'm convinced.  Will buy a more trustworthy product when [SpyHunter] expires.").  These allegations adequately plead that ESG's business has been injured as a result of Bleeping's misrepresentations.

\* \* \*

In sum, the SAC adequately pleads each element of ESG's Lanham Act claim. Bleeping's motion to dismiss this claim is, therefore, denied.

## CONCLUSION

For the foregoing reasons, Bleeping's motion to dismiss is granted in part and denied in part.  ESG's trade libel/commercial disparagement claim is dismissed.  Bleeping's motion is in all other respects denied.  The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 16 and 28.

The parties are directed to confer with each other and submit to the Court, by Monday, July 18, 2016, a proposed Civil Case Management Plan and Scheduling Order in accordance with the Court's Individual Rules.  *See* http://www.nysd.uscourts.gov/judge/ Engelmayer.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 8, 2016
       New York, New York